FARMERS' LOAN & TRUST CO. et al. v. TOLEDO, A. A. & N. M. RY. CO. et al.

(Circuit Court, N. D. Ohio, W. D. April 3, 1895.)

1. CORPORATIONS—RIGHTS OF STOCKHOLDERS—DEFENDING ON BEHALF OF COMPANY.

Where a petition by stockholders to be allowed to defend against the foreclosure of a mortgage, after decree taken pro confesso, fails to show that any attempt has been made to induce the board of directors to make the proposed defenses, and the averments as to collusion affect but four of the eleven directors, and it does not affirmatively appear that the other seven would not, if requested, make such defenses, the petition is defective; but if it discloses a valid, equitable defense, which the directors have failed to make, and the foreclosure would probably obliterate all interest of the stockholders, an opportunity will be allowed petitioners to apply to the board of directors, and, on their failure to make the defense, petitioners will be allowed to intervene to make it.

2. SAME—ESTOPPEL TO DENY CORPORATE EXISTENCE.

In an action to foreclose a mortgage securing bonds of a consolidated railroad corporation of Ohio and Michigan, where, from the time of the

consolidation, it exercised the franchises of a consolidated corporation, without objection from the state, or the stockholders, who appeared and voted as its stockholders at its annual meetings, it is a de facto corporation, though there was a failure to give the notice to stockholders, or to file the certificate of consolidation required by Rev. St. Ohio, §§ 3380–3382, and both such de facto corporation and its stockholders are estopped to assert its unauthorized existence as a corporation to avoid the bonds.

3. SAME—INCREASE OF STOCK—VALIDITY OF BONDS—ESTOPPEL.
Conceding that Rev. St. Ohio, § 3287, limiting the bonded indebtedness of a railway corporation to the amount of its capital stock, applies to a consolidated corporation of Ohio and Michigan, where the bonds actually issued under a mortgage do not exceed the capital stock as increased at a corporate meeting, both the corporation and the stockholders are estopped to deny the validity of the bonds for failure to give notice of the meeting at which the increase was authorized, and to file the certificate required by Rev. St. Ohio, §§ 3307–3310, regulating the increase of capital stock of railroad companies, the corporation having assumed the character and capacity of a corporation with such increased amount of stock by an almost unanimous vote of the stockholders, and for two years exercised the functions incident thereto without objection from either the state or the stockholders.

4. SAME—BONDS—RATIFICATION.
Corporate bonds and mortgages, issued without authority, are ratified by the payment of interest for three years on the indebtedness thus represented.

5. SAME—VALIDITY OF BONDS—ESTOPPEL.
Where railway bonds, and the mortgage securing them, limit the amount of bonds to be issued per mile of road, but both the stockholders and the directors know and acquiesce in the issuance of bonds at a greater rate, both the corporation and the stockholders are estopped to urge the limitation of the mortgage to defeat the bonds issued in excess of that limitation.

Bills in equity by the Farmers' Loan & Trust Company and others against the Toledo, Ann Arbor & North Michigan Railway and others to foreclose certain mortgages. The suits were consolidated, and decrees were taken against defendant pro confesso. Subsequently George W. Murray and others, as a committee of the stockholders, petitioned to be made parties defendant, and allowed to file an answer on behalf of the company.

This is a consolidation of suits for the foreclosure of one general and six divisional mortgages on the railroad of the Toledo, Ann Arbor & North Michigan Railway Company. A decree for sale has been entered in accordance with the prayers of the several bills, and advertisement has been begun under the sale. The cause is now brought before the court on a petition of George W. Murray, Thomas A. McIntyre, William H. Male, Joseph Richardson, Edmund C. Stedman, and James B. Clews, averring themselves to be a committee appointed by persons holding a majority of the $6,500,000 par value of the issued shares of the defendant railway company, to represent them in this suit. They pray to be allowed to be made parties defendant herein, and to file an answer on behalf of the railway company, contesting the validity of the general mortgage and the bonds it purports to secure. The company itself filed no answer, but allowed the decree to be entered by default.

The Toledo, Ann Arbor & North Michigan Railway Company until April, 1893, was operating a railroad extending from Toledo, Ohio, through the state of Michigan, to Frankfort, on the east shore of Lake Michigan, and steam vessels upon Lake Michigan for the transportation of freight cars from Frankfort to the western shore of that lake. The railroad was the result of the consolidation of the roads of six different companies. They were as follows: (1) The road of the Toledo, Ann Arbor & Grand Trunk

Railway Company, extending from Toledo to Ann Arbor, 52 miles, with a branch line from Ann Arbor to Pontiac. (2) The road of the Toledo, Ann Arbor & North Michigan Railway Company, extending from Ann Arbor to St. Louis, in Michigan, a distance of 97 miles. (3) The road of the Toledo, Ann Arbor & Mt. Pleasant Railway Company, extending from St. Louis to Mt. Pleasant, 21 miles. (4) The road of the Toledo, Ann Arbor & Cadillac Railway Company, extending from Mt. Pleasant to Cadillac, a distance of 61 miles. (5) The Toledo, Ann Arbor & Lake Michigan Railway Company, extending from Cadillac to Frankfort, 63 miles. (6) The road of the Frankfort & Southeastern Railway Company, which was embraced within the line operated by the Toledo, Ann Arbor & Lake Michigan Railway Company, extending from Thompsonville to Frankfort, a distance of 22 miles. There was a divisional mortgage on the Grand Trunk division of $1,260,000, on the North Michigan division of $2,120,000, on the Mt. Pleasant division of $400,000, on the Cadillac division of $1,260,000, on the Lake Michigan division of $767,900, on the Frankfort & Southeastern division of $235,000, and the consolidated mortgage covering the entire line was for $1,443,000. In April, 1893, upon the bill of a judgment creditor, a receiver was appointed to take charge and operate the railroad of the defendant company. In September, 1893, bills were filed in this court, in the circuit court of the United States for the Eastern district of Michigan, and in the circuit court of the United States for the Western district of Michigan, to foreclose the various divisional mortgages, and also to foreclose the consolidated mortgage of the defendant company. The appearance of the defendant company was duly entered in November, 1893, in each court and case. All the foreclosure bills in each court were consolidated. In February, 1894, no answer having been filed, decrees pro confesso were taken against the defendant. Nothing was done in the causes thereafter until January, 1895, when a decree for foreclosure and sale under the consolidated and the divisional mortgages was entered in this court and in the circuit courts for the Eastern and Western districts of Michigan. At the time the decree was entered an application was made on behalf of the petitioners, or some of them, to be made parties, that they might file answers for the corporation, and contest the validity of the bonds issued under the consolidated mortgage, averring that they were informed by rumor that quite a number of the bonds secured by the consolidated mortgage had been diverted to the private uses of the officers of the company before the receivership. It was held by this court at that time that a mere rumor was not sufficient evidence upon which to base such an application, and further, that the petitioners, by their long delay since the decree pro confesso, had waived any right which they might have had, if exercised in due time, to prevent a sale of the property, when such a sale could be stopped by the payment into court of interest upon the outstanding bonds under the order allowing redemption contained in the decree. The default upon which foreclosure is asked in this case is a default in the payment of interest, and not in the payment of the debt. There was inserted in the decree, however, a provision that the decree for sale should not in any way be taken to prejudice the right of any interested party to appear before a decree for distribution of the proceeds of sale was made, to contest the validity of the claim of any bondholder. At the same time an order was made by the court permitting the stockholders to examine the books of the railroad company for the purpose of general investigation. Under this order, petitioners employed an expert, who has been examining the books since the entry of the decree, and the present petition was filed as a result of his investigation. It was filed the day before the advertisement was begun for the sale of the railroad to take place early in April. The petition sets out the various mortgages, and the steps heretofore taken in this cause; alleges that the actions to foreclose the mortgages were begun without the knowledge of the petitioners; avers that at the last stockholders' election, in April, 1894, proxies were secured from owners of stock represented by the petitioners for the purpose of electing George W. Quintard, Amos F. Eno, J. Edward Simmons, and Robert M. Galloway, with seven others, directors; that since the election they have called no meeting to consider the interests of the company or the stockholders, and have taken no means to file answers

to the bills; that the four above-named directors thereafter became the members, and a majority of the members, of a committee, acting solely in the interest of the bondholders for the reorganization of the railway company; that they never laid before the board of directors, as such, their plan of reorganization, and that the other directors have had no opportunity to express views concerning the same; that in their statement as a committee, recommending their plan of reorganization, they have described the common stock of the defendant company as worthless, although the stock did at one time sell as high as $40 a share; that this plan was formulated on October 25, 1894, and that neither before that time nor after were any steps taken by the directors to protect the interests of the company in this litigation; that the petitioners are informed that the large amount of the consolidated bonds were diverted from the true and lawful purpose of their issue, and that many were used, as petitioners believe, as collateral security for the individual indebtedness of one or more of the former officers of the company; that the plan of reorganization by the Quintard committee treated the stock as worthless, and gave no opportunity to the stockholders to join in the plan of reorganization; that the petitioners, constituting another reorganization committee, devised a more equitable plan, in which the stockholders were given an interest in the new company; that upon the order heretofore made by this court, giving the stockholders an opportunity to examine the books, an expert accountant reports that there were net earnings over and above the operating expenses and the fixed charges for 1889 of $33,000, for 1890 $60,000, for 1891 $2,000, and 1892 $10,000, excluding the payment of the salaries of the president and vice president, and the deduction for bad debts in 1890 of $25,000,—showing, as petitioners claim, that the common stock had some value. The petition and the amended petition then state four grounds of defense which the directors should have made for the company, and which they ask to be made parties for the purpose of setting up in an answer. The first defense proposed is that the Toledo, Ann Arbor & North Michigan Railway Company, which, since April, 1888, down to the time of the receivership, in April, 1893, did business, exercised franchises, and operated a railroad as a consolidated corporation of Michigan and Ohio, never had a legal existence, because the proper steps for consolidation required by the statute of Ohio had never been taken, and therefore that the bonds purporting to be issued by such a pretended corporation, having no legal existence, must be invalid. The second defense proposed is that the defendant company had a capital of $6,500,000, and under the laws of Ohio had no authority to issue a mortgage to secure an indebtedness exceeding the amount of its capital stock; whereas the indebtedness claimed under the consolidated mortgage would increase its total indebtedness to more than $7,000,000. Third. The petitioners propose to defend against the payment of the bonds and the foreclosure of the consolidated mortgage, on the ground that the issuance of the mortgage and the bonds was never authorized by the stockholders or directors of the railway company purporting to issue the same in accordance with the laws of Ohio. Fourth. The fourth defense proposed to be made by the petitioners on behalf of the company is that on the face of the bonds and by the terms of the mortgage the issue of bonds thereunder was strictly limited to $21,000 per mile of line of present railroad and $18,000 per mile of line thereafter acquired by new construction, purchase, or consolidation, sidings not included, except that, in addition, $50,000 might be issued for terminal and other specific uses; and that in violation of this provision of the mortgage there were issued of the consolidated bonds in the purchase of the Toledo, Ann Arbor & Lake Michigan Railway and of the Frankfort & Southeastern Railway a sufficient number, taken with the bonds and obligations of those roads, assumed by the defendant company as part of the purchase price thereof, to make the amount paid $30,000 a mile. The evidence upon which these defenses are claimed by petitioners to be well founded is referred to in the opinion. The prayer of the petition is that the petitioners be made party defendants to the cause in behalf of the stockholders whom they represent and of said company, to answer the bill of complaint, and that an order may be entered granting them leave to answer, and to set up the facts stated in the petition

by way of defense within a reasonable time, and that, pending the hearing of issues made by the answer, the decree for sale may be revoked and annulled, or its execution suspended.

Hoadley, Lauterbach & Johnson and Samuel E. Williamson, for petitioners.

Turner, McClure & Rolston and Brown & Geddes, for Farmers' Loan & Trust Co.

Swayne, Swayne, Hayes & Tyler, for Central Trust Co.

Doyle, Scott & Lewis, for bondholders' committee.

Before TAFT, Circuit Judge, and SEVERENS and RICKS, District Judges.

TAFT, Circuit Judge (after stating the facts).    The petition is undoubtedly defective in this: that it does not show that any attempt has been made to procure the board of directors to make the defenses for the company which the petitioners ask to be allowed to make.    The averments of the petition with reference to collusion affect but four of the eleven directors, and it does not appear affirmatively that the other seven directors would not, if requested, make the defenses which the petitioners propose to set up.    But, if there is a valid and equitable defense to the claim of $1,443,000 against the defendant company, which the directors have failed to make in an action for foreclosure, which will in all probability obliterate all interest that the holders of 65,000 shares of the capital stock of the defendant company have in the property, the court, though it might be obliged to dismiss the petition for the objections urged to it, would certainly give the petitioners an opportunity to apply to the board of directors, and, on their failing to make the defense, would then allow the petitioners to intervene to make it.    The refusal of the board of directors to make a valid and equitable defense to the foreclosure of the mortgage, and a sale of all the franchises and property belonging to the road, when the existence of such a defense is brought to their knowledge, would of itself constitute such gross neglect or fraud on their part as to require the court to permit their interested cestuis que trustent, the stockholders, to make the defense themselves.    Dodge v. Woolsey, 18 How. 331. We therefore find it necessary to proceed to the consideration of the defenses proposed to be made and their validity.    Before doing so, however, we should observe that the averments in the petition with reference to the two plans of reorganization have no relevancy whatever to the question before the court except as evidence to enforce the charge against four of the directors that they are interested as bondholders not to make the defenses for the company which, as directors, it would be their duty to make. With the fairness and equity of the reorganization plans the court has nothing to do.    Any person, or any number of persons, may purchase the road at the public sale.    If the bondholders choose to buy in the road to protect their security, there is no obligation upon them whatever to divide the benefit of their purchase with

the stockholders. If the stockholders are of opinion that the road exceeds in value the debts which rest upon it, they are at liberty to bid such a sum for the road as will pay the debts and will leave a surplus for division among themselves upon their stock. In no other way can they secure action by the court to assist them in obtaining value for their stock.

We come now to the defenses which the petitioners propose to set up. The first is that the defendant company is not a legally incorporated company of Ohio. The averment of the amendment to the petition is that in February, 1888, "there was in existence another corporation, having the same name as the defendant. and owning a railroad from Toledo, Ohio, to Mt. Pleasant, Mich., And another corporation, known as the Toledo, Ann Arbor & Cadillac Railway Company owning a railroad from Cadillac, Mich., to Mt. Pleasant, Mich., both of said roads being parts of the railroad sought to be mortgaged under said consolidated mortgage, and described therein; and that on the 27th day of February, 1888, the boards of directors of said first-named corporation, and on the 29th day of February the board of directors of said last-named corporation, at meetings held by said boards respectively, adopted resolutions approving an agreement for consolidation, previously executed by three directors of each of said corporations for said corporations, respectively, but without any previous authority of either of said boards; that meetings of stockholders of said two corporations were held on the same day of the meeting of directors at which only a part of the stockholders of said respective corporations were present in person or by proxy, at which meetings resolutions were adopted purporting to approve of said agreement; that, as your petitioners are informed and believe, no notice, as required by law, was given of said stockholders' meetings of either of said corporations, and that it was impossible to give such notice between the time when said meetings of directors were held and when said meetings of stockholders were held, both directors and stockholders having met upon the same day; that, as your petitioners are informed and believe, said agreement was filed in the office of the secretary of state of the state of Michigan, but the same has never been filed in the state of Ohio, and that no effort was made to conform to the laws of Ohio regulating the consolidation of railway companies, and that no consolidation was effected or attempted to be effected of said companies, except as hereinbefore stated; and that said consolidated mortgage is not, therefore, a lien upon any part of said railroad." Section 3380 of the Revised Statutes of Ohio permits a railway company organized in that state to consolidate its capital stock with the capital stock of another company in an adjoining state, organized for a like purpose, where their roads, united and constructed, will form a continuous line for the passage of cars. Section 3381 prescribes the conditions and restrictions for such consolidation. First, the directors of the two companies are to enter into a joint agreement, describing the terms thereof with all the details necessary to

procure the new organization and consolidation. Second, the agreement is to be submitted to the stockholders at a meeting called separately for the purpose of taking the same into consideration, and due notice of the time and place of such meeting and the object is to be given by written or printed notices, addressed to each of the registered stockholders, and by a like notice published in a newspaper where the company has its principal office; "provided, that in case all the stockholders are present at such meeting, in person or by proxy, such notice may be waived in writing." A vote is required to be taken upon the question of the consolidation under the agreement, and if two-thirds of all the votes cast at the meeting be for the adoption of the agreement, the fact has to be certified by the secretary of each of the companies, and these certificates, together with a certified copy of the agreement, must be filed in the office of the secretary of state. Section 3382 provides:

"When the agreement is made and perfected, as provided in the preceding section, and the same or a copy thereof filed with the secretary of state, the several companies parties thereto shall be deemed and taken to be one company, possessing within this state all the rights, privileges and franchises, and subject to all the restrictions, disabilities and duties of a railroad company."

It is to be presumed, in the absence of an averment to the contrary in the petition, that the holders of two-thirds of the stock in each of the constituent companies at the two meetings approved the joint agreement. Since that time no objection seems to have been made by any stockholders or by the state to the exercise by the defendant company of its franchises as a consolidated corporation of Ohio and Michigan. It actually exercised franchises as such corporation. It operated as such a railroad from Toledo to Lake Michigan. The holders of the 33,000 shares of the stock of the defendant company represented by petitioners or their predecessors in title appeared and voted as stockholders in the defendant company at its different annual meetings, the last of which was held in April, 1894. It may be true that the failure to give the notice required in the statute, or the failure to file the certificate of consolidation required in the statute, prevented the new consolidated company from being legally incorporated under the laws of Ohio, but it is manifest that the new consolidated company was a de facto corporation of Ohio, while, in the absence of any averment to the contrary in the petition, we may assume that it was not only a de facto, but a de jure, corporation of the state of Michigan. It is too well established to need discussion that both a de facto corporation and the persons exercising the rights of stockholders in such a corporation are estopped to assert its unauthorized existence as a corporation to avoid a debt incurred by it in the actual exercise of corporate franchises and the doing of corporate business. Ashley v. Supervisors, 8 C. C. A. 455, 60 Fed. 65; Phinizy v. Railroad Co., 62 Fed. 678; Dallas Co. v. Huidekoper, 154 U. S. 654, 14 Sup. Ct. 1190; Close v. Cemetery, 107 U. S. 466, 2 Sup. Ct. 267; Bank v. Matthews, 98 U. S. 621;

Macon Co. v. Shores, 97 U. S. 272; Chubb v. Upton, 95 U. S. 665; Douglas Co. v. Bolles, 94 U. S. 104; Wallace v. Loomis, 97 U. S. 146; Leavenworth Co. v. Barnes, 94 U. S. 70; Casey v. Galli, Id. 673. Certainly it showed no neglect of duty or bad faith on the part of any of the directors not to set up such a defense for the foreclosure of the consolidated mortgage.

Second. The petition alleges as follows:

"Your petitioners further respectfully show that the capital stock of said alleged consolidated railway company did not and does not exceed $6,500,000, and that the issue of mortgage bonds exceeding that amount was, under the laws of Ohio, unauthorized and void; and that the said consolidated mortgage, being for the sum of $10,000,000, and the bonds issued thereunder, together with the bonds secured by mortgage previously issued upon the so-called 'divisions' of said railroad, exceeding the amount of said capital stock, should be held to be unauthorized and void."

Section 3286 provides:

"A company may issue bonds, convertible or otherwise, bearing a rate of interest not exceeding seven per centum per annum, to an amount not exceeding two-thirds of its capital stock, actually subscribed, for one or more of the following purposes: completing or extending its road, constructing branch roads, laying double or additional track, increasing its machinery or rolling stock, building depots or shops, making improvements, paying its unfunded debts, or redeeming its bonds; and it may secure the bonds issued for such purposes by mortgage on its property, or otherwise, if authorized by the vote, in person or by proxy, of holders of a majority of the stock upon which all the installments called for by the board of directors have been paid; but such vote shall be taken at a meeting of stockholders of which thirty days' notice shall be given."

Section 3287 provides that:

"A [railroad] company may borrow money at a rate not exceeding seven per centum per annum, for any purpose that the same may be needed in its business and execute bonds or promissory notes therefor, in sums of not less than one hundred dollars; and it may secure the payment of such bonds and notes by a pledge of its property and income; but the aggregate indebtedness authorized by this and the preceding section shall not exceed the amount of the capital stock of the company."

It appears by a reference to the minutes of the company that the capital stock, until April 16, 1890, was 53,000 shares; that upon that day, at the regular annual meeting of the stockholders, at which were represented 43,160 shares, it was resolved to increase the capital stock of the company from 53,000 shares of $100 each to 80,000 shares of $100 each; and that an amended charter was adopted by the meeting for this purpose, all the shares represented voting in the affirmative. At the same annual meeting it was resolved that 9,000 shares of the new stock be delivered to the Toledo, Ann Arbor & Lake Michigan Railway Company as part payment for the purchase of its property and franchise, and that 15,000 shares be delivered as part payment for the Cincinnati, Saginaw & Mackinaw Railway Company, its property and franchises. The latter purchase fell through, and the stock was not delivered. Subsequently, at the annual meeting in 1892, the stockholders authorized the delivery of 5,000 shares of the company's capital stock to the Frankfort & Southeastern Railway Company as part payment for the purchase of that company's prop-

erty and franchises.    The additional stock over and above the original 53,000 shares was voted at subsequent annual meetings. The consolidated mortgage, purporting to secure $10,000,000 of bonds, is said to have been authorized at a stockholders' meeting on January 15, 1890, but no bonds were issued under that mortgage, so as to become a binding obligation of the company, until after the annual stockholders' meeting of April, 1890, when the increase of stock and the amended charter were adopted by the unanimous vote of all the stock represented.    The number of bonds issued under the consolidated mortgage upon which a decree has been rendered is $1,443,000.    This sum, taken with the underlying additional mortgages, amounts to something over $7,000,000.

Section 3307 of the Revised Statutes of Ohio provides that a company may increase its capital stock whenever, in the opinion of the directors, the same is insufficient for the construction of its road, or it becomes necessary for the transaction of its business to construct a second track, or to buy another road within the state, or for the purpose of extending the same, or to refund its debts, or for completing its line of road.    Section 3308 provides that before any stock can be issued a majority of the directors shall call a meeting of the stockholders, designating the time, place, and purpose of the meeting, and the amount of stock required, that notice shall be given at least 30 days previous by publication in two newspapers, and by a like notice, mailed 30 days previous, to each stockholder whose residence is known.    And that, "if at such meeting the consent of the holders of a majority of the stock upon which they would be entitled to vote at an election of directors of the company be given, the stock of the company may be increased to such amount as may be decided necessary or requisite for the purposes named in the preceding section."    The purpose recited in the resolution adopted in this case was that of extending the line of the railroad company by purchase.    Section 3310 requires that "ten days after the meeting the president and secretary of the company shall make an abstract, stating the whole amount of pre-existing capital stock, the amount authorized, the number of shares of stock upon which all the installments called for by the board of directors have been paid, and the vote at the meeting, and add a certificate that the provisions of the two preceding sections have been fully complied with; and they shall make affidavit to such abstract and statement and file the same in the office of the secretary of state, who shall cause the same to be recorded."

It may be conceded that the course actually taken was not the statutory method provided for increasing the capital stock; that it was defective in the character of the notice, which was a notice for a mere annual meeting; and also in the failure to file the proper certificate with the secretary of state, and to have the same recorded in his office.    But we are of opinion that the same reasons make this defense unavailable to the petitioners which prevailed against the first one considered.    The corporation in

which the petitioners are shareholders assumed the character and capacity of a corporation with 80,000 shares of stock, and, without objection from the state, acted as such, and had so acted for more than two years. It had assumed that character upon the authority of the almost unanimous vote of its shareholders, and had continued to exercise the functions incident thereto without dissent from any of them. Upon consideration of these facts it is clear that not only the corporation, but the stockholders also, are now estopped to defeat any obligations assumed by that company on the ground that its stock was not equal to 80,000 shares. Conceding that the limitation in section 3287 applies to a consolidated company, and that such a company cannot have an aggregate indebtedness, secured by mortgage, in excess of its capital stock, the limitation, it will be observed, is not upon the amount of the mortgage, but upon the amount of the bonds issued which the mortgage secures. The fact, therefore, that the mortgage is for $10,-000,000, does not invalidate it as security for $1,443,000 of bonds issued under it. Of course, it is a mortgage which can be enforced only to the extent of the actual obligations created under it, and, as those obligations do not exceed $1,443,000, it is only to be regarded as a mortgage for that amount. Taking it as such, with the other indebtedness, the total is less than $8,000,000, which the stockholders of the company by unanimous vote agreed should be the capital stock of the company, and under which vote a large part of the increased stock was issued and subsequently voted. Under these circumstances we do not think that the corporation can be heard to urge section 3287 as a reason for invalidating the bonds by it, and that the stockholders who acquiesced in this action for more than three years are equally estopped to make such a defence. 2 Cook, Stocks & S. § 760; Allis v. Jones, 45 Fed. 148; Reed's Appeal, 122 Pa. St. 565, 16 Atl. 100; Fidelity Insurance, etc., Co. v. West Penn. & S. C. R. Co. (Pa. Sup.) 21 Atl. 21; Wood v. Water Works Co., 44 Fed. 146; Water Co. v. De Kay, 36 N. J. Eq. 548. We do not think that the decisions of the supreme court in Nesbit v. Riverside Independent Dist., 144 U. S. 610, 12 Sup. Ct. 746, and kindred cases, in which bonds were held invalid when issued in excess of an absolute limit fixed by statute,—as, for example, a percentage of the taxable value of property in a county,—have application to a case of this sort, where it is plainly within the power of the corporation, by properly increasing its stock, to issue bonds equal in amount to the increase, and where an increase is attempted, and the only defect is an irregularity in the method by which the increase is sought to be made; rather than in a total want of power to secure it.

The third defense proposed is that the consolidated mortgage was never authorized by the stockholders and directors at a legally called meeting. There is nothing in this defense. It rests on the absence of a record of such a meeting in the minutes of the railroad company. Ashley, one of the officers of the railroad com-

pany, testifies positively that there was such a meeting, and reference is made in the subsequent minutes to such a meeting of the stockholders and of the directors. Whether the meeting was duly called in accordance with the requirements of the statute is immaterial, because the binding effect of the mortgage and the bonds have been recognized at every annual meeting since its issuance, and by the payment of interest upon the indebtedness thus represented for three years. The binding effect of the mortgage and the bonds was recognized by the petitioners themselves, when acting as a reorganization committee. If there was any defect by reason of a want of original authority to issue the bonds and mortgage, it has been cured by subsequent ratification. Hotel Co. v. Wade, 97 U. S. 13; Supervisors v. Schenck, 5 Wall. 772; Clay Co. v. Society for Savings, 104 U. S. 587.

Fourth. The next and last defense proposed to be made is that the bonds issued under the mortgage were diverted from their lawful purpose, or, rather, that there was an overissue of them beyond the limit fixed in the mortgage itself and in the bonds themselves for the purposes therein mentioned. The mortgage and the bonds, as already stated, limit the amount to be issued to $21,000 per mile of road then owned, and to $18,000 per mile of road to be constructed or acquired. The bonds issued under the consolidated mortgage to buy the Lake Michigan road and the Frankfort & Southeastern road, with the obligations assumed as part of the purchase price, exceed $30,000 per mile. The limitation in the mortgage was not a limitation upon the power of the corporation itself. It was a contract with the bondholders, affecting the extent of their security. It is true that if the only authority for the issuance of these bonds was to be found in the resolution authorizing the mortgage and the bonds, the limitation in the mortgage would be a limitation upon the power of the directors to use the bonds in the purchase of roads at a greater rate than $18,000 per mile. But, if both the stockholders and the directors acquiesced in the issuance of bonds, at a greater rate under this mortgage, neither the corporation nor the directors nor the stockholders can now be heard to urge the limitation of the mortgage as a reason for defeating the obligation of bonds issued in excess of that limitation. The evidence overwhelmingly establishes that all the stockholders knew that the bonds were being issued in such a way as that the amount paid for the newly-acquired roads exceeded a rate of $18,000 per mile. It was brought to their attention by annual reports, and the report of the petitioners themselves recommending their plan of reorganization shows conclusively that they had full knowledge upon this subject. It might be some ground for complaint on the part of persons who purchased bonds under the mortgage if those who were to share in the security were increased in number in violation of the assurance in the mortgage and the bonds. But certainly the corporation, which has taken the money or property of the bondholders with the acquiescence and the knowledge

of its stockholders, cannot be heard to urge such a limitation by way of the defense to a suit to recover on the bonds thus issued. The proof shows that all the bonds of the consolidated company were issued for value. A slight attempt is made to show that some of the bonds were disposed of by James Ashley, Jr., financial agent of the company, as collateral for his individual notes, but it has failed, and, whether it be true or not, the validity of the consideration received by the company for the great bulk of the bonds is undisputed and indisputable. The mortgage must therefore be foreclosed, and, if any of the bonds were fraudulently issued, they may be attacked before distribution, under the express provision of the decree for sale already made. The petition is dismissed.