## GERMANIA SAFETY-VAULT & TRUST CO. et al. v. BOYNTON.

(Circuit Court of Appeals, Sixth Circuit. January 7, 1896.)

### No. 341.

1. CORPORATE OBLIGATIONS—USE BY OFFICERS—BONA FIDE PURCHASER.

One who takes corporate bonds from officers of the corporation to secure their private indebtedness is bound to ascertain their right to dispose of the bonds.

2. SAME—DECLARATIONS OF OFFICERS.

The declarations of the officers as to their authority to use the corporate bonds for their private purposes are not binding on the corporation.

3. SAME—VALIDITY OF CONTRACT.

The acquiescence of all the directors and stockholders of a corporation will not validate a transaction outside the corporate powers.

4. SAME.

No authority in a corporation to lend credit to another is to be implied from the fact that it may be beneficial to the corporation to do so.

5. SAME—BONA FIDE PURCHASER.

Plaintiff having $15,000 invested as a partner in a firm which also owed him $10,000, and the two other members each owing him $15,000, he agreed to lend them money to buy him out and pay him off,—an arrangement most advantageous to him, if he could obtain good security. The other members had no property but stock in a corporation of which they were president and secretary, and the board of directors of which they controlled, and it was agreed that bonds of the corporation should be furnished him as security. His attorney accordingly drew up a resolution, which was passed by the board, reciting authority in the president and secretary to issue bonds, the receipt of a bid for the bonds from them as individuals, and the acceptance of the bid. The bonds were then delivered to plaintiff as security for his claim against the president and secretary. The coupons were never presented for payment, but were canceled by him on their maturity. *Held*, that plaintiff was not a bona fide purchaser acting in reliance on the resolution so passed.

6. SAME—AUTHORITY OF PRESIDENT.

In such case, the president being an interested party, his decision that the terms of the bids for the bonds were complied with was not binding on the corporation.

Appeal from the Circuit Court of the United States for the District of Kentucky.

This bill was filed by C. W. Boynton, a citizen of the state of Illinois, against the Kentucky Malting Company, a corporation of the state of Kentucky, and others, for the purpose of enforcing for his benefit a mortgage upon the property of the malting company, made in 1882, to secure an issue of 120 bonds, for $500 each, bearing interest payable semiannually. The malting company was a corporation organized in 1876, under the general laws of Kentucky, for the purpose of buying and selling malt, grain, and supplies needed by distillers and brewers. The mortgage in question, and the bonds executed thereunder, were authorized by proper action of the board of directors, taken in October, 1882, and the bonds matured in October, 1892. Prior to September, 1885, these bonds were used from time to time by the malting company as collateral security for loans obtained from banks at Louisville, Ky. The complainant, Boynton, claims that in September, 1885, the entire issue of these bonds was delivered to him by E. W. Herman and J. H. Pank as collateral security for a note for $55,000 executed by J. H. Pank & Co., a firm composed of E. W. Herman and J. H. Pank, and by Herman and Pank individually. That note bore interest at the rate of 7 per cent., payable semiannually, and was payable in four years. Subsequently, by

payments, the debt was reduced, and 40 of the bonds, together with all past-due coupons, were first canceled by him, and then surrendered to Herman and Pank. Thus the suit now involves only the remaining 80 bonds, with interest since January, 1892. The malting company made a general assignment in 1892 to the appellant the Germania Safety-Vault & Trust Company for the benefit of all its creditors. Subsequently a suit was begun by one J. N. Struck, in a court of the state of Kentucky, against the malting company and its assignee, claiming to be a creditor secured by a statutory mechanic's lien under the law of Kentucky. Boynton made defendants to his bill the Germania Safety-Vault & Trust Company (assignee aforesaid), J. N. Struck, and William Tillman (trustee under the mortgage sought to be enforced). The defense made to the relief sought by Boynton is that the bonds were never delivered by the Kentucky Malting Company, and are not its obligations, but that they were misapplied by Herman and Pank, officers of the corporation, and used by them as security for their private debts, with the knowledge and connivance of the complainant, Boynton. This defense was not sustained by the circuit court, which gave Boynton a decree according to the prayer of his bill. The Germania Safety-Vault & Trust Company (as assignee), J. N. Struck, and William Tillman (as trustee) have appealed from this decree, and duly assigned error.

Otto A. Wehle, for appellants.
A. P. Humphrey, for appellees.

Before TAFT and LURTON, Circuit Judges, and HAMMOND, J.

After stating the facts as above, the opinion of the court was delivered by LURTON, Circuit Judge.

The conceded facts are that these bonds were used by. Herman and Pank as collateral security for their individual debt to Boynton. Herman and Pank were both officers of the Kentucky Malting Company, and as such their possession of these corporate securities was presumably the possession of the corporation. Boynton knew that Herman was the president, and Pank the secretary and treasurer, of the corporation whose bonds they proposed to give him as security for their individual debt. Under these circumstances, it was his duty to inquire as to their title to these bonds, or their authority to use them for their private purposes. If he took them without informing himself as to their right to dispose of them, he cannot stand as a bona fide purchaser of negotiable securities for value, if it should turn out that they had no right to use them as security for their own debt. The general presumption in favor of such officers of a corporation might support a disposition of the securities for any apparent corporate purpose, but that presumption does not extend so far as to justify one who accepts such securities in payment of, or as security for, the private obligation of the officer. There is no presumption that even a general agency will support a transaction by which the agent is to profit at the expense of his principal. The dealing between Boynton, on the one side, and Herman and Pank, on the other, was concerning their individual matters, in which the corporation was not concerned. When, therefore, Herman and Pank proposed to use securities of the corporation in which they were officers for their private purposes, the knowledge of Boynton that they were officers of the corporation issuing the bonds was notice to him that they had no authority to use them

for such purposes. If he took them without ascertaining their title or authority, he did so at the risk of losing them, if in fact they had abused their trust. These principles are well settled. West St. Louis Sav. Bank v. Shawnee Co. Bank, 95 U. S. 557; McLellan v. File Works, 56 Mich. 583, 23 N. W. 321; Claflin v. Bank, 25 N. Y. 293; Wilson v. Railway Co., 120 N. Y. 145, 24 N. E. 384; Garrard v. Railway Co., 29 Pa. St. 154; New York Iron Mine v. First Nat. Bank of Negaunee, 39 Mich. 650; Moores v. Bank, 111 U. S. 165, 4 Sup. Ct. 345; Farrington v. Railway Co., 150 Mass. 406, 23 N. E. 109; Bank of New York Nat. Banking Ass'n v. American Dock & Trust Co., 143 N. Y. 559, 38 N. E. 713; Board v. Sinton, 41 Ohio St. 504-513. Neither is it sufficient, under such circumstances, to inquire of the officer himself, as to his authority. When acting apparently outside the general scope of his authority, and for himself, the declarations of the agent are not admissible against his principal. Herman and Pank were engaged, to the knowledge of Boynton, in a personal and private transaction, and they could make no declarations concerning their authority to act for their corporation which would bind the Kentucky Malting Company. Moores v. Bank, supra; Farrington v. Railroad Co., supra; Bank of New York Nat. Banking Ass'n v. American Dock & Trust Co., supra; New York Iron Mine v. First Nat. Bank of Negaunee, supra. But it is said for Boynton that if the duty of inquiry was, under the circumstances, thrown upon him, he did inquire, and was shown a resolution of the directors and stockholders of the corporation, passed September 8, 1885, by which it appeared that Herman and Pank had become the purchasers of these bonds, and that he had a right to rely upon the truth of the action therein recited. That resolution is in these words:

"September 8th, 1885. Called a meeting of directors and stockholders of the Kentucky Malting Company, held at their office this 8th day of September, 1885, all members being present. Mr. Herman offered the following resolution, which was unanimously adopted: 'Whereas, the board of directors of the Kentucky Malting Company authorizes the president and secretary to issue 120 mortgage bonds, of $500. each, to bear 6 per cent. interest, dated September 30, 1882, and due in ten years from date, and said bonds having been issued accordingly, but not disposed of; and whereas said company has now received a bid for said bonds from E. W. Herman and J. H. Pank,— we unanimously recommend and agree to accept said bid, and hereby authorize and instruct the president to deliver said bonds to the said E. W. Herman and J. H. Pank, upon their complying with the terms and conditions of their said bid.' [Signed] E. W. Herman. J. H. Pank. Frank Senn. Adam Stumpff. F. Reidhar."

That resolution is found on the minutes of the corporation, and it was signed by every one then owning shares. It did not, however, speak the truth, and was, on the evidence of Pank himself, a fraud and a deception. No bid was ever made by Herman and Pank, or either of them, or intended to be made. No bonds were sold to them, or intended to be sold. The bonds then belonged to the corporation, and were in its treasury. Herman has not testified. He is silent, and silence, under the circumstances, is significant. Pank, a witness altogether in sympathy with appellee, has been ex-

amined as a witness by Boynton, and for the purpose of presenting a defense to the presumptions arising out of the circumstances affecting Boynton's good faith. Pank, in substance, says that he and Herman explained to the stockholders that they purposed to use these bonds as collateral security to their own note in a private transaction with Boynton, and explained how it was to the interest of the Kentucky Malting Company that it should lend their credit to them in the way desired, and that the bid mentioned was only a form adopted to authorize them to pledge the bonds effectually for their individual debt. Thereupon the resolution was passed, and the minute signed. Reidhar, one of the stockholders present, died before this controversy arose. We cannot, therefore, know whether he understood the deceptive character of the resolution, or the explanation said to have been made. He was a very old and infirm man, and probably understood little or nothing about the matter. The other two stockholders assenting were Senn and Stumpff. They held comparatively little of the stock, and took little or no interest in the conduct of the corporation business. Both these men have testified. They are Germans, speak English badly; are, as they put it, "poor scholars," and are, manifestly, dull men,—very easily imposed upon and deceived. They have no interest apparently in the result of this suit, the malting company being insolvent in any event. There is nothing in their evidence which induces us to suspect their honesty or candor. They both say that they did not understand the resolution to recite any bid or sale to Herman or Pank, and that no authority was asked by Herman and Pank to use the bonds to secure their debt to Boynton, or the debt of J. H. Pank & Co. to Boynton or any one else. In substance, they say that it was explained that the resolution was to give Herman and Pank authority to use the bonds for raising money for the benefit of the malting company, and nothing was said as to using them as security for Pank & Co. or Herman and Pank, or either of them. In other words, they did not consent to any use of the bonds for the benefit of Herman and Pank, and that it was explained to them that the object was to enable Herman and Pank to use the bonds for corporate purposes. On their evidence, the authority given to Herman and Pank was intended to better enable them to negotiate the bonds for corporate purposes. A negotiation for the private purposes of Herman and Pank was not within the scope of the authority intended to be granted by the resolution to which they assented. As between Pank and these witnesses, we accept their version of what was said in explanation of the resolution. Pank's testimony is not candid, and is not consistent. Much of it is unreasonable. Especially is this so in his labored and unrestrained swearing as to the necessity of the continuance of the business of J. H. Pank & Co., to the credit of the Kentucky Malting Company. This we shall have further occasion to refer to. If we accept the theory supported by the evidence of Pank, what the directors and stockholders actually intended to do, and did do, was to authorize himself and Herman to pledge these bonds to secure their individual debt to

Boynton. The corporation had no power to lend its credit to Herman and Pank. Its obligations entered into for that purpose would be void in the hands of one who took them with notice. The consent of the stockholders would not strengthen the case. A defect in the power of the corporation is not supplied by the agreement of the corporators. In Iron Co. v. Riche, L. R. 7 H. L. 653, the case was that of a company incorporated for the purpose of manufacturing railway carriages. It purchased a concession for a railroad to be built in France, and then agreed to assign the concession to a French company, which was to supply materials and receive payments from the English company. It was held that the contract was ultra vires, and had not benn validated by the subsequent approval of all the stockholders. Lord Cairns said:

"If every shareholder had been in the room, and every shareholder had said, 'That is a contract which we desire to make, which we authorize the directors to make, to which we sanction the placing the seal of the company,' the case would not have stood in any different position from that in which it stands now. The shareholders would thereby, by unanimous consent, have been attempting to do the very thing which, by the act of parliament, they were prohibited from doing."

There are many cases to the same effect. Thomas v. Railroad Co., 101 U. S. 83; Central Transp. Co. v. Pullman's Palace Car Co., 139 U. S. 59, 11 Sup. Ct. 478; Humboldt Min. Co. v. American Manufacturing, Mining & Milling Co., 10 C. C. A. 415, 62 Fed. 356.

The powers of a corporation are those expressly granted, and such implied powers as are necessary to carry out those specifically named. No authority to lend credit to another is to be implied from the mere fact that it might be beneficial to the corporation to support the credit of another, or that thereby business might be induced or increased. Davis v. Railroad Co., 131 Mass. 258.

"A corporation," said this court in Marbury v. Land Co., 10 C. C. A. 401. 62 Fed. 342, "is impliedly prohibited from doing anything which it is not expressly permitted by its charter to do, or which is not fairly incidental and necessary to the enjoyment of that which is expressly permitted." In Humboldt Min. Co. v. American Manufacturing, Mining & Milling Co., cited heretofore, the question was as to the validity of a guaranty by a corporation organized to make ironwork for mining plants, of the contract of another corporation for the erection of a mining plant, upon the expectation of securing the sale of the ironwork used in the plant. We held that guaranty ultra vires, the court saying:

"The objection to the guaranty is that it risks the funds of the company in a different enterprise and business, under the control of another and different person or corporation, contrary to what its stockholders, its creditors, and the state have a right, from its charter, to expect."

In the case of McCutcheon v. Capsule Co. (decided at this term of the court) 71 Fed. 787, we held that the investment of the funds of one manufacturing corporation in the stock of another, as an investment to be held by the buying company, was not within the express or implied powers of the buying corporation, and was an

act ultra vires,—not validated by the agreement of all the stockholders.

An effort has been made to show that it was much to the advantage of the malting company to support the credit of Herman and Pank by the use of its bonds as collateral for their note. Boynton, Herman, and Pank had for two years been partners, under the style of J. H. Pank & Co. That firm was engaged in business as malsters at Chicago, and as such had bought grain for the malting company, and sold it much malt. The transactions between the corporation and the firm had been numerous, and involved large sums. The credit extended by the firm had doubtless been of no little advantage. J. H. Pank, though the secretary and treasurer of the malting company, lived in Chicago, and managed the business of J. H. Pank & Co. The entire capital of that firm had been advanced by Boynton, either as capital in the business to his credit, or as capital put in for Herman and Pank through loans to them. Boynton, on the expiration of the term of the partnership, in September, 1885, expressed a desire to withdraw, and proposed to sell out to Herman and Pank; and for this purpose he proposed to nominally lend them $50,000 for four years, taking their note secured by a pledge of $60,000 in the mortgage bonds of the Kentucky Malting Company. Herman wished the loan increased to $60,000. A correspondence ensued between them, and three of Herman's letters have been introduced by Boynton as evidence. In one of these letters, written August 19, 1885, and but a few days before the transaction now involved was consummated, Herman expresses his opinion as to the relative value of the business relations of the corporation and the firm, and his view as to the importance of these bonds to the corporation as collaterals to protect their credit. He says:

"I admit that we had some advantage in the last two years in Mr. Pank being in Chicago, but, on the other hand, has not your business with us been many thousands of dollars in your pocket?"

In another letter, bearing date August 20, 1885, in which he is insisting upon a loan of $60,000 to himself and Pank, he says, concerning the use of these bonds to secure such a loan, that:

"Again, the bonds have been a great convenience to us here, on temporary loans of small amounts, and I deem them almost a necessity to hold as a reserve to fall back upon in a case of necessity. I don't, therefore, feel that we can let them go, in the manner now spoken of, short of the amount I mentioned, since the Kentucky Malting Company will not receive much, if any, benefit therefrom. As mentioned yesterday, if you come down I can convince you of your investment being a double secure one. I want to go to Birmingham Saturday, or Sunday noon, and, if you conclude to feel favorable towards my proposition, I would like to have you here Wednesday next, to show you all you want to see."

The evidence relating to the business relations between the firm and the corporation, both before and after the pledging of these bonds, makes it clear to us that the malting company was much more important to J. H. Pank & Co. than J. H. Pank & Co. were to the malting company. To Herman and Pank the continuance of

the business of J. H. Pank & Co. was doubtless important. As Herman says, in the letter from which we have quoted, the business obtained from the malting company was worth thousands to J. H. Pank & Co. The credit it had given to the malting company, neither before nor after this transaction, was by any means equal to the benefit of these bonds to the corporation as a means of obtaining credit. Thus, if the case is to stand upon a balancing of interests in favor of the lending of these bonds to Herman and Pank in order to keep J. H. Pank & Co. going, or keeping these bonds and using them, as they have been theretofore used, as collateral with the Louisville banks, then we must decide that the interests of the corporation were sacrificed in the private interest of Herman and Pank. But if we are mistaken about this, and it was of great advantage to the corporation to keep Pank established at Chicago, and to keep the firm of J. H. Pank & Co. on its feet, still the transaction, from that standpoint, was not within the express or implied power of the Kentucky corporation, and was not vitalized by the acquiescence of all the shareholders.

This brings us to the vital question in the case. For Boynton, it is said that he did inquire as to the authority under which Herman and Pank proposed to pledge these bonds, and that his attorney was shown the resolution passed by the directors and stockholders, heretofore set out in full. It is further said that inquiry was then made of Herman whether the terms and conditions referred to in the resolution had been complied with, and that he replied that they had been complied with, and that he and Pank had bought the bonds outright from the company. It has been argued that Boynton was under no obligation to make further inquiries, and had a right, under the circumstances, to rely upon the truth of this recorded action of the stockholders, and the declarations of Herman that the terms and conditions of sale had been complied with. In the light of all the facts and circumstances known to Boynton, we do not think he had any right to rely upon the truth of this resolution, or the declarations made by either Herman or Pank. He was undoubtedly anxious to sell out, and wind up his connection with these men. He had $15,000 capital invested as a partner in the firm of J. H. Pank & Co. In addition, the firm was indebted to him, as a firm, in about $10,000 more. Herman owed him, individually, $15,000, and Pank owed him the same, being sums advanced for them to enable them to pay up their several contributions to the capital of J. H. Pank & Co. Neither Herman nor Pank appear to have had any outside means whatever. For the realization of these large sums he could apparently rely only upon the assets of J. H. Pank & Co., which would involve a winding up of the business of that concern, payment of firm debts, adjustment of the equities between the partners, and finally an application of the interest of Herman and Pank in the surplus assets to the payment of their individual liabilities to him. In addition, Boynton owned the malting house used by the firm, and for which it had been paying a rental of $6,000 per annum, and taxes and repairs. He was

deeply interested in the continuance of this latter arrangement, and his agreement to lend them $55,000 with which to buy him out and pay off their individual liabilities on account of capital advanced for them, involved a leasing of this malt house on the old terms for a term of four years. Good, sound, negotiable collateral for their notes was a very desirable improvement upon his situation, and a prolonged tenancy added much to the temptation to shut his eyes to the methods adopted for obtaining the desired security. Only a few days before the matter was consummated, he knew that these bonds were the property of the Kentucky Malting Company. He also knew that Herman and Pank, notwithstanding this fact, proposed to use them for their private purposes. This would have been a fraud upon the corporation, and his acceptance of them, with knowledge, would have been a connivance in the breach of trust, such as would have defeated his title. When asked if the original negotiation with Herman and Pank had proceeded upon the idea that they would buy the bonds from the corporation, he answered:

"No, sir; it was not. I supposed that Mr. Herman and Mr. Pank were the Kentucky Malting Company, and could do as they pleased, but my attorney required that the directors should take some action showing that they were authorized to use the bonds in this way."

Being thus advised that some action of the corporation was necessary to authorize "the use of the bonds in this way," he relied upon that attorney to see that some action was taken by the corporation which would authorize such use of the bonds. As to the steps taken to procure such authority, he was asked this question:

"Did not Ling and Pank and yourself, together, devise a certain entry on the minute book of the Kentucky Malting Company, which you demanded should be made before you would take the bonds? Answer. I did not. Q. Did not Ling? A. Ling, as I remember, required that the directors should take some action to authorize the use of the bonds. Q. Your lawyer told you, before you took those bonds, some action on the part of the stockholders of the corporation was necessary, to make the issue of these bonds lawful, did he not? A. Yes, sir; I said to him that Mr. Herman and Mr. Pank were the Kentucky Malting Company, and he said, 'There is another stockholder.' They said that he was a small stockholder, and had nothing to do with the affairs of the company; but he said it was necessary for the directors to hold a meeting, and legalize or authorize in some way the transfer of the bonds. Q. Do you know whether Mr. Ling, your attorney, got such a paper, showing the authority? A. I do not. There was something said to him that satisfied him that it was all right."

Now, the thing done which satisfied Ling, Boynton's attorney, that the matter was all right, was the adoption of a line of action which Ling himself mapped out. Ling says that he advised Pank "to call a meeting of the stockholders, and present them a bid for the bonds, and have it accepted by them." Now, did Ling or Boynton believe that a bona fide purchase of these bonds was to be made by these men, who, so far as this record shows, had not been able to pay a dollar of capital into the business of J. H. Pank & Co., or that the corporation would let go, for a song, securities valued by Boynton himself at $55,000, and which he knew were of the utmost value to the Kentucky corporation as collateral on

which to borrow money for its business necessities? What was meant by making "a bid," and getting the stockholders "to accept"? Did he intend to suggest a colorable transaction, which on its face would show title in Herman and Pank, and operate as an estoppel on the corporation if Boynton's title should be challenged thereafter? That Boynton was anxious to sell out, and secure these bonds as security, is, on the record, very plain. This we may presume Ling well knew. The object was to put the bonds in such a situation as that Boynton should be protected in taking them as collateral security. If Ling, in arranging the method by which this was to be done, believed honestly that the purpose of Herman and Pank was to buy the bonds, out and out, from the corporation, what course would he have advised for the protection of his client, in view of the fact that the men who proposed to buy were themselves the chief officers of the corporation? Undoubtedly, as a good lawyer, he would have said:

"Inasmuch as your interests and those of your corporation will conflict in this case, the utmost good faith and fair dealing must be shown." "Make your proposition a matter of record, and see to it that some impartial member of the corporation shall stand between it and you."

What course did he pursue? He himself wrote the resolution now relied upon as estopping the corporation. That resolution recites:

" And whereas said company has received a bid for said bonds from E. W. Herman and J. H. Pank, we unanimously recommend and agree to accept said bid, and hereby authorize and instruct the president to deliver said bonds to the said E. W. Herman and J. H. Pank, upon their complying with the terms and conditions of their said bid."

What the "bid" was, which was so unanimously satisfactory, is nowhere stated. But still more extraordinary is the remarkable conclusion that the stockholders, in the same unanimous way, "authorize and instruct the president to deliver said bonds to the said E. W. Herman and J. H. Pank, upon their complying with the terms and conditions of their said bid." Who was to decide what these "terms and conditions" were? Who was to decide whether they had been complied with? Who was to receive the consideration? The contention maintained by the learned counsel for appellee is that Herman himself, under the resolution, was to determine these questions, and that his declaration that the terms and conditions had been complied with concludes the corporation, as between it and Boynton, who, through his agent, had devised and procured this most extraordinary corporate action. Herman, the agent of the seller, is to determine these questions, although he is himself the buyer, and directly interested in deciding against the seller and in favor of the buyer. The general rule is that the same person cannot act as agent for both parties in the same transaction, unless each party expressly consents to such double agency. In such case the agent is substantially but an arbitrator. The instances in which such a double agency has been sustained have generally been where there were in fact two principals, and an agent representing both,

because of his presumed impartiality. That is not this case, if we accept the construction placed upon this by Ling, who, after it had been adopted, solemnly called upon Herman, "as president," to declare and· say whether Herman, as the buyer of these bonds, had complied with the "terms and conditions" of his purchase. Under that construction we have a case where a business corporation constitutes its chief officer its agent to determine what the terms and ʾconditions ·are of a sale to himself of corporate bonds, and whether he has complied with these terms and conditions, and, upon a decision of these questions, to deliver its bonds to himself. That this was the purpose of Ling, we have no serious doubt. That there are cases where an agent has been expressly authorized, from the necessity of the situation and the peculiarity of the circumstances, to represent both himself and his principal in a matter in which their interests were in conflict, we have no doubt. Where third parties have acquired rights in innocent reliance upon the acts of such an agent, they are protected, even though the agent abused his authority, upon the ground that, when one of two innocent parties must suffer from the dishonesty of a third, that one should bear the loss who, by his negligence, has enabled the third to occasion it. Merchants' Bank v. State Bank, 10 Wall. 646. But, as observed by Judge Cooley in New York Iron Mine v. First Nat. Bank of Negaunee, 39 Mich. 650:

"There must be one innocent party and one negligent party, before the requirements of the maxim are answered, and the conduct of ·the plaintiff is therefore as important as that of the defendant."

If, therefore, this resolution was prepared, in the negligent form in which it was passed, by Boynton or his agent, Ling, and with no reasonable expectation or belief that a bona fide purchase of these bonds was contemplated, Boynton was not innocent or misled, and cannot avail himself of the maxim. That he had no reasonable ground for believing that Herman and Pank intended to actually buy these bonds, or were financially able to do so, we are convinced. The very form of the resolution concocted by Ling is strong evidence that it was intended as a mere form of sale, intended and understood by Boynton, as well as Herman and Pank, as authorizing the use of these corporate securities by Herman and Pank for their own purposes,—a use which it is altogether possible they regarded as beneficial to the corporation. A most pregnant circumstance tending to show that Boynton was not deceived, and that he understood that these bonds had not been bought by Herman and Pank, but continued to be the property of the corporation, is found in the fact that none of the coupons on these bonds were ·ever presented to the corporation for payment. Herman and Pank paid the interest on their note to him. But he was aware of the fact that the accruing coupons were suffered to lie unpaid, and when the first note made by Herman and Pank fell due, four years after date, the bonds bore eight past-due coupons. These matured coupons he cut off and canceled, and gave to Pank. A payment was then made on the old·note, and a smaller note taken for the

remainder, and one-third of the bonds which he had were canceled. Why did Boynton cancel these coupons and bonds, if he believed the bonds to have been bought, out and out, by Herman and Pank? Their cancellation destroyed them as corporate obligations, and put them in a situation in which they could not be asserted by Herman and Pank, whom he now claims he supposed to be the owners of them. By cancellation he increased the value of the bonds retained by himself, and this he knew, and accounts for his action in having them canceled when they were returned. It may be said that he may have learned after accepting the bonds that they were not in fact the property of the pledgors, and hence his cancellation of them when returned. But Boynton makes no such explanation, and does not offer any reason for conduct most inconsistent with his claim that he was an innocent purchaser. This failure to present any coupons for payment by any of the parties also accounts for the delay of the corporation in making the defense now made. It in no way ratified this misuse of these bonds, by payments made on any of them; and neither the shareholders not directly implicated, nor the creditors, seem to have known anything of the use made of these bonds, or that they had been in any way negotiated, until this suit was begun. Taking all the facts in the case, it is incredible that Boynton should have been innocently misled by the resolution adopted by the corporation. If he was misled at all, it was because he entertained the opinion that he was safely intrenched behind a colorable sale, to which were attached the signatures of all the shareholders. We are not, however, content to accept the construction placed upon this resolution by the learned district judge, who thought that Herman was thereby authorized to determine and decide that the terms and conditions of sale had been complied with. Where it is claimed that an agency is so broad as to conclude the principal by the declarations or conduct of the agent, in a matter in which the agent's interests are adverse to the principal, the authority must be explicit, and leave no room for a different interpretation. The court of appeals of New York, in the case of Bank of New York Nat. Banking Ass'n v. American Dock & Trust Co., 143 N. Y. 559, 38 N. E. 713, where the question was as to the validity of a warehouse receipt signed by the president, purporting to be issued to himself, and indorsed by himself to a bank as security for money loaned, it was held that a by-law authorizing the issuance of warehouse receipts by the president of the corporation did not authorize the signing of a receipt in his own favor. In regard to the construction of an instrument supposed to convey such authority, the court said:

"It is an acknowledged principle of the law of agency that a general power or authority given to the agent to do an act in behalf of the principal does not extend to a case where it appears that the agent himself is the person interested on the other side. If such a power is intended to be given, it must be expressed in language so plain that no other interpretation can rationally be given it, for it is against the general law of reason that an agent should be intrusted with power to act for his principal and for himself at the same time. The by-law is general in its terms, and could be fully carried

out to its fair and legitimate purpose by excluding from its meaning the case of either officer acting in his own personal matter."

While the resolution recites that the "bid" of Herman and Pank was accepted, yet the authority of the president to deliver the bonds depended upon a precedent condition,—compliance with "the terms and conditions of that bid." What evidence was offered Boynton that this precedent condition had been performed? None, except the unsupported declarations of these two men that they had bought the bonds, out and out. It has not been insisted that what Pank said binds the corporation. He was known to be an officer of the corporation, and the securities he had in possession were known to have been the securities of the corporation, but a few days before. His possession was presumably the possession of the corporation, and his claim to have bought them was a self-serving declaration made in his own interest, and adverse to the interests of his corporation and to the presumptions growing out of his official connection. If the "bid" referred to in the resolution had been by a stranger, and the president authorized to deliver the bonds "upon compliance with the terms and conditions of the bid," a very different case would be presented. One finding the bonds in the possession of the bidder might well presume that they had been properly delivered. The .fact of possession would have justified belief in ownership. But this is not the case if the "bid" appears to have been made by the official custodian of the bonds. There was no apparent change in the possession, and the declarations of neither Herman nor Pank would, in the absence of other evidence, rebut the presumption arising out of their official relation to the bonds. Why should Herman's declarations be any more admissible against the corporation than those of Pank? Counsel say the reason is that the resolution authorized him to deliver the bonds upon compliance with the terms of sale, and from this is to be presumed authority to determine the fact of compliance, and that, therefore, his admission as to compliance is binding upon the corporation. This argument depends upon an implication, and does not find support in any express authority to decide and accept compliance. No such implication is admissible when the fact and sufficiency of compliance involve the determination of a matter in which his interests were in direct conflict with those of the corporation. In accepting payment, whether in money or obligations, for the bonds sold, he would have to assume an authority not expressly conferred. In declaring that the terms and conditions of his bid had been complied with, he was acting for himself, and in his own interests. If Boynton chose to rely upon the truth of his assertion, he did so at his peril. If it turned out that it was untrue, he must take the consequences. The truth of the matter, according to his witness, Pank, is that no bid was ever made, and no purchase of the bonds ever intended. According to what the same witness says, the resolution was a mere form, intended to authorize Herman and him to pledge the bonds for their own debt,—a proceeding consented to, as he claims, because it was supposed by the stockholders

that the interests of the corporation would be subserved indirectly. A consent to such a lending of credit as he claims would, as we have already seen, be in excess of the corporate powers, and ineffectual to charge the corporation in favor of one affected by notice. On the other hand, an inquiry would have disclosed that the resolution was accepted and signed as a matter of form, not to authorize the pledging of the bonds in aid of the credit of J. H. Pank & Co., or of Herman and Pank as individuals, as claimed by Pank, but as a form of authority which would better enable Herman and Pank to negotiate the bonds, or pledge them for corporate purposes only. Of course, if this "form" had been so worded as to mislead an innocent purchaser into the belief that Herman and Pank were the absolute owners of the bonds, the corporation might well have been estopped, and compelled to bear the loss, rather than have it thrown upon one misled by a negligent trust in their fidelity. But we are satisfied—first, that the form in which this authority was conferred did not in fact deceive or mislead Boynton; and, second, that it was gross negligence to assume that Herman, when acting for himself, was speaking for the corporation, when he declared, as president, that he, as an individual, had complied with the terms and conditions of his bid. The "form" in which the corporation delegated authority to Herman did not warrant any inference that he was authorized to bind the corporation by his self-serving declarations. The decree must be reversed, and the bill dismissed.