Judgment reversed, new trial ordered, costs to appellant to abide event.

---

New Britain National Bank, Appellant, *v.* A. B. Cleveland Company (Limited) and Others, Respondents.

*Corporation — alienation of property in fraud of creditors — mortgage to trustees, not void on its face — personal property cannot be mortgaged to pay debts — transfer of property in contemplation of insolvency — effect of an overissue of bonds under chap. 394 of 1888 — equitable estoppel — mortgage not given to terminate the business of a corporation.*

Where third parties acting in good faith have relied upon the existence of corporate authority to do an act and have acquired rights in the premises, stockholders of the corporation, who have acquiesced in the act and have neglected promptly to condemn it and seek judicial redress, will be equitably estopped from thereafter claiming that the act was illegal or prohibited.

In an action brought by a judgment creditor of a corporation to set aside an alienation of all its property, it appeared that on April 17, 1889, the A. B.

Cleveland Company (Limited), being in financial difficulties, although believed to be solvent by its creditors and the officers of the corporation, and its president having disappeared leaving the company threatened with numerous litigations, issued bonds to the amount of $425,000 to secure the payment of its debts and at the same time conveyed all its property, both real and personal, to three trustees by a mortgage which authorized the trustees upon default in payment of the principal and interest due on the mortgage to sell the property and pay over the proceeds to the bondholders, the plaintiff and all the other creditors except one, assenting to this arrangement, in pursuance of which plan the trustees entered upon the execution of their duties; among the creditors presenting claims was the plaintiff, which apparently did not receive any bonds although they were tendered to it.

)n February 28, 1890, the trustees sold the entire property for the sum of $100,000 to two persons who intended to transfer it to the Cleveland Seed Company of New Jersey, about which time the trustees sent a letter to the creditors giving their reasons for the sale, and stating that liens to the amount of $115,000 upon seed in their hands were about to be foreclosed; that in order to realize the largest amount from the stock they had made such sale, and that the creditors would receive a dividend of twenty-five cents on the dollar.

It further appeared that the plaintiff commenced two actions on promissory notes held by it, recovering a judgment in the first action on August 7, 1889, and in the second action on October 5, 1894.

The present action was commenced on the 9th day of December, 1892, for the purpose of having the mortgage declared fraudulent and void, the plaintiff contending (1) that the mortgage was void upon its face; (2) that it was void because executed in violation of the provisions of chapter 394 of the Laws of 1888, which prevents a corporation from issuing bonds or mortgaging its real estate for any other than the legitimate purposes of its business; (3) that it was void within the meaning of the Revised Statutes (1 R. S. 603), in that it was made by the A. B. Cleveland Company (Limited) in contemplation and with knowledge of its insolvency; (4) that such transfer, being in fact a termination of the regular business of the corporation, and so accepted by the transferees, was illegal as against the creditors of the corporation.

*Held,* that the mortgage was not void on its face;

That it was not void as having been executed in violation of chapter 394 of the Laws of 1888, since it was not foreign to the lawful business and objects of a corporation to secure payment of its debts by mortgaging its property;

That while it appeared that by the terms of the mortgage not only the real estate but the personal property — which constituted the bulk of the assets of the corporation — was transferred to the trustees as collateral security for the payment of the bonds, and such transfer of the personal property was unauthorized and rendered the mortgage voidable, yet, inasmuch as the plaintiff was cognizant of all the facts at the time of its execution, the mortgage might be regarded as confirmed by it, either by assent at the time or by subsequent ratification; that such ratification might be presumed from the fact that the plaintiff had slept on its rights for at least three years since the mortgage was made;

That the transfer of property forbidden by the Revised Statutes (1 R. S. 603) must have been made because of existing or anticipated insolvency;

That it was not enough that insolvency and the act co-existed; and that as there was no evidence that the mortgage was made in contemplation of insolvency it could not be declared illegal on that ground;

That the fact that the bonds issued exceeded the amount which the corporation could lawfully issue did not render the mortgage void;

That the statute, chapter 394 of the Laws of 1888, did not expressly make an overissue of bonds void, but in such case rendered the director voting for the issue thereof personally liable to the holder of such bonds or mortgage;

That while it might be possible that a creditor or stockholder of the corporation could prevent an overissue or have such an overissue set aside, the court would not interfere where it appeared that the bonds and mortgage were issued with the assent of all the stockholders and all of the creditors, except one, and that the property covered by the mortgage had been sold to another corporation;

That under the evidence offered in the case the mortgage was not executed with a view to terminating the regular business of the corporation, but, on the contrary, for the purpose of continuing the business and realizing for its creditors the full amount of their claims.

Follett, J., dissenting.

Appeal by the plaintiff, the New Britain National Bank, from a judgment of the Supreme Court in favor of the defendants, entered in the office of the clerk of the county of New York on the 21st day of March, 1895, upon the decison of the court rendered after a trial at the New York Special Term dismissing the plaintiff's complaint.

*C. Bainbridge Smith,* for the appellant.

*Hamilton Wallis,* for A. B. Cleveland Company (Limited) and others, respondents.

*Charles F. MacLean,* for C. N. Jordan, respondent.

*H. Aplington,* for H. K. Thurber, respondent.

O'Brien, J. :

The court having rendered a decision which does not state separately the facts found, we are required to review all questions of fact and of law and award to either party such judgment as such party may be entitled to. (Code Civ. Proc. § 1022.)

This action was brought by a judgment creditor, after the return of executions unsatisfied, to set aside, pursuant to sections 1781 and 1782 of the Code of Civil Procedure, an alienation of all the property of the A. B. Cleveland Company (Limited) to three trustees, and by the latter through an intermediary to the Cleveland Seed Company On the 17th of April, 1889, the A. B. Cleveland Company (Limited) made and issued 425 $1,000 bonds in order to secure certain debts and obligations it had incurred in and about its business. Contemporaneously therewith it conveyed and transferred all of its property of every nature and kind to three trustees. The mortgage contained the usual clause that in default of payment of principal and interest, the trustees were to take possession of the lands and property and sell and dispose of the same, and, after defraying expenses, to pay over the proceeds to and amongst the parties holding the bonds.

That this or some other action by the company was necessary is evident from its condition at that time. A few days prior to the execution of the mortgage the president had disappeared, leaving the company's affairs in confusion. Thereafter suits were commenced on the company's obligations, and in addition it was threatened with other suits involving damages to a large amount, which were based on alleged fraudulent practices of the president for which the persons injured claimed that the company was liable. Notwithstanding the fact that these latter claims were never enforced, the stockholders were alarmed and steps were taken to place the company's property in such a position as to afford security for the legitimate creditors. With this end in view, it was proposed that all the legitimate creditors should pool their claims, including expenses of litigation, and should be paid *pro rata* out of the proceeds of the company's property which should be set aside for this purpose. To carry out this plan, the mortgage assailed was made, and an agreement, signed by all the creditors save one, was entered into, under which the property was to be turned over to the three persons named as trustees under the conditions already referred to. With others, the signature of the plaintiff was made by its president " subject to the approval of the board of directors." Under this arrangement, the property was turned over to the trustees, who entered upon their duties; and among the creditors presenting claims was the plaintiff,

which does not appear to have received the bonds, though they were tendered, and many of the other creditors holding claims to a large amount did receive them. Although the substance of the agreement was known to the board of directors of the plaintiff and talked over, no action was taken, but it was kept informed from time to time through communications from the trustees of what was being done and the necessity for changes being made in the original plan.

An examination of the books of the company prior to the making of the agreement exhibited the company as solvent, its affairs showing assets all told of about $557,000, and liabilities of $425,000, leaving a surplus of $132,000; and that all the parties from such examination believed the company solvent, we think, is evident, although it appears that at that time at least $31,000 of its paper had gone to protest. Subsequent to the execution of the mortgage an effort was made to realize on the assets, and a further examination was made into the affairs of the company by the trustees, and there then developed a situation entirely different from what had been expected or shown at the time the mortgage was made. Many of the bills receivable which were included in the statement of the assets were found to be uncollectible, and, according to one of the witnesses, the losses which the company sustained in an attempt to realize on the assets amounted to about $200,000. This, in addition to the inability of the trustees or officers to carry on the business profitably, necessitated a change in the original plan, and a new one was proposed by a circular letter of November 1, 1889, which, as it was not accepted by the creditors or acted upon, need not be further referred to.

Thereafter, and on February 28, 1890, the trustees sold to two persons the entire plant, property and business of the company for the sum of $100,000, for the purpose of transferring and conveying the same to the Cleveland Seed Company of New Jersey, which prior to that time had been organized. The trustees, in their letter to the creditors under date of February 15, 1890, giving the reasons that induced the sale, after stating that the liens on the seed in their hands, which were about to be foreclosed, amounted to $115,000, and referring to the necessity of prompt action in order that the largest amount might be realized from the stock, say: " To this

end we have sold the assets of the company for $100,000 (the purchasers to arrange for the payment of the advances), out of which sum, after paying part of the expenses incurred by the trustees, there will remain in our hands a dividend of twenty-five cents on the dollar for the principal of your claims, which dividend will be paid the creditors on proof of claims."

The only other facts necessary to be referred to are that the plaintiff commenced two actions on promissory notes held by it, one on or about the 18th day of April, 1889, in which judgment was rendered on August 7, 1889, and in the second action it recovered a judgment in the Supreme Court on the 5th of October, 1894; the summons in this action now before the court bearing date December 9, 1892, and having been tried in November, 1894.

The validity of the mortgage made to the trustees and of the sale by them to the Cleveland Seed Company is assailed upon the ground of fraud and illegality, the plaintiff contending (1) that the mortgage is void on its face; (2) that it is void because executed in violation of chapter 394 of the Laws of 1888, which prevents a corporation from issuing bonds or mortgaging its real estate for any other than the legitimate purposes of its business; (3) that it is void within the meaning of the Revised Statutes (1 R. S., part 1, tit. 4, chap. 18, § 4, p. 603), in that it was made by the A. B. Cleveland Company (Limited) in contemplation and with knowledge of its insolvency; (4) that such transfer, being in fact a termination of the regular business of the corporation, and so accepted by the transferees, is illegal as against the creditors of the corporation.

With respect to the first ground, that the mortgage is void on its face, most of the vices assigned to the mortgage are disposed of by the case of *Brackett* v. *Harvey* (91 N. Y. 214), wherein will be found a discussion and disposition favorable to the defendants of the questionable provisions in the present mortgage, except one which we will discuss in connection with the second ground of illegality assigned — that the mortgage is one made with a purpose foreign to the lawful business and objects of the corporation.

The mortgage itself recites, and it is so made to appear, that the issuing of the bonds as originally intended, and the making of the mortgage to secure them, were acts done in order to secure certain debts and obligations incurred in and about conducting and operating the busi-

ness of the company. That it is not foreign to the lawful business and objects of a corporation to secure payment of its debts by way of mortgaging its property, has been determined in the case of *Carpenter* v. *Black Hawk Mining Co.* (65 N. Y. 43). It was therein said: " Corporations, unless restrained by their charters, have the power to mortgage their property to secure borrowed money or their debts. But in this connection attention is called to chapter 40 of the Laws of 1848, which is the geﬁeral act to authorize the formation of corporations for manufacturing, mining, mechanical or chemical purposes, and the second section of which provides that while such a company shall be capable in law of purchasing, holding and conveying any real and personal estate whatever which may be necessary to enable it to carry on its operations, it shall not mortgage the same, or give a lien thereon." As therein shown, this clause was modified so as to enable a corporation to mortgage all or any part of its real estate to secure the payment of any debt upon the assent of at least two·thirds of the stockholders. As therein further said: " This provision removes the restraint as to mortgaging real estate, leaving the restraint as to mortgaging personal property still in force." By chapter 394 of the Laws of 1888 it is provided that corporations such as the defendant here may " borrow money for the legitimate purposes of such corporation, and for such purpose to issue bonds * * * or to mortgage any real estate·which it may have or possess, * * * but the amount of such bonds and such mortgages outstanding at any one time, shall not exceed one-half of the value of the corporate property of such corporation." Then follows a provision that any issue of bonds beyond the amount specified " shall render every director voting the same personally liable to any holder of such bonds or such mortgages for any damage caused by such overissue to such holder." While, therefore, the power of corporations to mortgage their real estate has in some respects been enlarged, the restraint as to mortgaging personal property is still in force.

It will be noticed that by the terms of the mortgage here involved not only the real estate but the personal property — which constituted the great bulk of the assets of this corporation — was transferred to the trustees as collateral security for the payment of the bonds. For this we can find no warrant or authority in law; and

unless, by assenting to the plan by which such personal property was transferred to the trustees the plaintiff is estopped from raising the question, we must conclude that the attempt to mortgage the personal property was void. Whether the plaintiff was estopped either by participating or assenting, or by failing to protest until the rights of other creditors had intervened, thus being guilty of *laches*, will be considered after we have disposed of the other grounds of invalidity assigned by the plaintiff, which in the order would bring us to the third, that it is void because made in contemplation of insolvency.

Upon this ground we think the plaintiff should fail, it appearing by fair preponderance of the evidence (if we might not be justified in saying it was uncontradicted) that at the time the mortgage was executed the officers and trustees and creditors, who participated in the plan, all believed that the company was solvent and able to pay its debts. The fact that subsequently, upon the attempt to realize upon the assets, and by a further examination, this belief was shown to be erroneous, does not color with illegality an act which, when done, was perfectly legal. It is true that certain notes of the company had gone to protest, and " the refusal of a corporation to pay its debts, notes or obligations at maturity is generally a suggestion of insolvency ; but whether such refusal results from the disability of the corporation to meet its obligations, or is based on other reasons, will ordinarily be best known to the officers and stockholders." (*Throop* v. *The H. L. Co.*, 125 N. Y. 530.) Here there was sufficient to justify all those in interest in believing that the failure to meet the company's obligations at maturity was not due to lack of assets, but to the bad management and misconduct of the president, who, after getting possession of certain of its moneys, had absconded, leaving the affairs of the company in utter confusion. The mere fact, therefore, that obligations were due and unpaid is not conclusive upon the question of insolvency or the question as to whether or not the mortgage, when made in that condition of the company, was one executed in contemplation of insolvency. " The statute makes the question depend upon what was passing in the minds of the officers of the company when the mortgage was executed." (*Paulding* v. *The Chrome Steel Co.*, 94 N. Y. 334, 341.) The act " must be in anticipation or in view of that condition. In

other words, the act must have been done because of existing or anticipated insolvency, or else it is not prohibited. It is not enough that insolvency and the act co-exist. (Id. 339.) "'Contemplation of insolvency' must also mean something more than mere expectation of its occurrence; it must include provision against its results, so far as the transferee is concerned, and that can only be applicable where he is already a creditor and the object is to take his debt out of the equal ratable distribution of the assets of the company when insolvent." (*Heroy* v. *Kerr*, 8 Bosw. 200.) We do not think the evidence would warrant the inference that this mortgage was made in contemplation of insolvency. When made it was with the consent of all the creditors except one, and though there are some variations between the agreement as entered into by the creditors and the terms of the mortgage itself, these are not material in view of the fact that after execution it was approved by the creditors.

It is true that the plaintiff's assent was, to some extent qualified, because, although signed by its president, there was a statement that it was subject to the approval of the board of directors. It is not claimed that the board of directors ever repudiated the action of the president, and although the matter, as already stated, was discussed, the board, as such, remained passive, and there is no question but that the bank and its officers had knowledge respecting the making of the mortgage and that the president had assented thereto. Knowing full well that other creditors were likewise interested, and it appearing that others subsequently signed the agreement to which the plaintiff's name was attached, it seems to us it was plaintiff's duty, if it intended to repudiate the agreement, to have done so promptly and before the rights of others had intervened. Although it be conceded that this mortgage is voidable, we think it was capable of confirmation either by assent at the time or by subsequent ratification, and it is difficult to predicate fraud of acts which are done with the assent and full knowledge of the person who subsequently assails them. (Bump on Fraudulent Conveyances, 464; *Phillips* v. *Wooster*, 46 N. Y. 415.) Here the plaintiff has slept on its rights for at least three years subsequent to the making of the mortgage, and during all that period, with full knowledge of what was going on, it stood by while the trustees, whose

good faith in endeavoring to realize on the assets of the company for the creditors is not brought in question, were doing the best they could, and when the result of their efforts did not realize the expectation of the plaintiff and the other creditors, the plaintiff brings this suit in equity for the purpose of undoing all that has been done, regardless of the rights of the other creditors, who, with the trustees, have in the meantime gone on relying, as they had a right to do, upon the supposition that the plaintiff had assented to the acts now complained of.  We think, apart from any other questions in the case, that the length of time which the plaintiff allowed to elapse and its active participation in the plans which were tried to realize on the assets of this company for the benefit of creditors, should prevent the plaintiff from obtaining any relief in this action.

With regard to the claim that this mortgage was in contravention of chapter 394 of the Laws of 1888, all that need be said is that even though the amount of bonds issued was more than the corporation could lawfully issue, this would not render the instrument void, but, as shown from the wording of the statute, would render the directors liable for such overissue at the instance of any holder of the bonds, and in this action the plaintiff is not suing as a bondholder.

It may be that, in addition to an action by a bondholder, any creditor or stockholder could prevent the issue of an amount of bonds in excess of that allowed by statute, and if such amount were issued could set the transaction aside, provided he had not assented to the same or was not estopped in some other way.   The language of the statute is : " But the amount of such bonds and such mortgages outstanding at any one time shall not exceed one-half of the value of the corporate property of such corporation.   Any issue * * * beyond the amount * * * shall render every director voting the same personally liable to any holder of such bonds or such mortgages for any damage caused by such overissue to such holder." The fact of an overissue of bonds would not, in the light of decisions, render such action absolutely void, so that at no time and under no circumstances could it be recognized, but under the authorities we think it would be voidable in favor of those who, as we have shown, could question the corporate action.

In *Kent* v. *Quicksilver Mining Co.* (78 N. Y. 159, 185) it is said :

" In the application of the doctrine of *ultra vires* it is to be borne in mind that it has two phases, one where the public is concerned; one where the question is between the corporate body and the stockholders in it, or between it and its stockholders, and third parties dealing with it and through it with them.   When the public is concerned to restrain a corporation within the limit of the power given to it by its charter, an assent by the stockholders to the use of unauthorized power by the corporate body will be of no avail.   When it is a question of the right of a stockholder to restrain the corporate body within its express or incidental powers, the stockholder may in many cases be denied, on the ground of his express assent or his intelligent though tacit consent to the corporate action.   If there be a departure from statutory direction, which is to be considered merely a breach of trust to be restrained by a stockholder, it is pertinent to consider what has been his conduct in regard thereto. A corporation may do acts which affect the public to its harm, inasmuch as they are *per se* illegal or are *malum prohibitum*.   Then no assent of stockholders can validate them.   It may do acts not thus illegal, though there is want of power to do them, which affect only the interest of the stockholders.   They may be made good by the assent of the stockholders, so that strangers to the stockholders dealing in good faith with the corporation will be protected in a reliance upon those acts.   The instance put in *Bissell* v. *Mich. So., etc., R. R. Co.* (22 N. Y. 269), is illustrative.   A bank has no authority from the State to engage in benevolent enterprises; and a subscription, though formally made, for a charitable object would be out of its powers ; but it would not be otherwise an illegal act; yet if every stockholder did expressly assent to such an application of the corporate funds, though it would still be in one sense *ultra vires*, no wrong would be done, no public interest harmed ; and no stockholder could object, or claim that there was an infringement of his rights, and have redress or protection.   Such an act, though beyond the power given by the charter, unless expressly prohibited, if confirmed by the stockholders could not be avoided by any of them to the harm of third persons.   This arises from the principle that the trust for stockholders is not of a public nature."

So with respect to the issue of bonds here ; there was no express prohibition in the statute making on overissue of bonds void, the

language being susceptible of the construction that a corporation such as the defendant should not have the power to issue in excess of a certain amount of bonds, and this is coupled with a remedy afforded to any one aggrieved as against those who should engage in the unauthorized act.

The case from which we have quoted (*Kent* v. *Q. M. Co.*) has been approved in many subsequent cases. Thus, *Martin* v. *N. F. P. Mfg. Co.* (122 N. Y. 165) is authority for the proposition that "if the officers or trustees of a manufacturing corporation do an unauthorized act, or incur indebtedness, which would not create a corporate liability, the stockholders may subsequently ratify, and so, validate the transaction." In that case the question was as to the validity of a mortgage given to secure notes which it was claimed were issued without authority, and which were subsequently ratified by the stockholders. It was therein said : " The stockholders are the equitable owners of the corporate property, and if the officers or trustees do an unauthorized act or incur indebtedness which would not create a corporate liability, the stockholders may subsequently ratify the acts and validate the originally unauthorized transaction." (Id. 172.) In *Skinner* v. *Smith* (134 N. Y. 240, 241), which was an action by a trustee of a manufacturing corporation to set aside certain transfers of its property alleged to have been made or authorized by the trustees as such to themselves individually, Mr. Justice FOLLETT, quoting with approval the case of *Kent* v. *Quicksilver Mining Co.* (*supra*), says : " A contract entered into by a corporation by the authority or direction of its trustees, with themselves, and for their benefit, or a transfer of its property by the authority of the trustees to themselves, may be set aside, in case it injures any public interest, or the private interest of any shareholder or creditor, even though the contract or transfer was executed in good faith by the trustees. But this rule is not broad enough to condemn as void on the ground of public policy all contracts and transfers exe-cuted by a purely private business corporation, with or to its trustees, in good faith, in case no public or private interest is harmed thereby. Such contracts are not void, but voidable, at the election of those who are affected by the fraud." And Mora-wetz in his work on Private Corporations, in speaking of the effect of general statutory prohibitions against the unauthorized exercise

of corporate powers, says (p. 626): "Statutes have frequently been passed, expressly prohibiting corporations from exercising any powers except those conferred by their charters. Sometimes these prohibitions are enacted in the form of general laws applicable to all corporations, and sometimes they are incorporated in special charters applicable to particular corporations only. Prohibitions of this description are merely declaratory of the general common-law prohibition against any exercise of corporate powers which has not been authorized by the Legislature; and there is no reason for supposing that the Legislature, in enacting such a prohibition, intends to give it any greater force or effect than the common-law rule. There are very strong reasons why such a prohibition should not be construed as rendering absolutely null and unenforcible corporate acts and contracts which are in excess of the company's chartered powers. A statutory prohibition against every unauthorized exercise of corporate power would apply with equal force to every act and contract made by a corporation without proper authority; and if it were construed to render any particular act or contract absolutely void, in legal contemplation, the same rule would be applicable in every case. Such a result would be productive of great injustice, as well as inconvenience. The slightest informality would become fatal to the validity of a corporate transaction, and it would be almost impossible to deal with a corporation with any degree of safety." And the same author, in speaking of the validity of corporate acts (p. 619), says: "It does not follow that, because the exercise of corporate powers is prohibited by the common law, any corporate acts performed in violation of this prohibition will not be recognized by the law as corporate acts. An illegal or prohibited transaction may or may not be recognized at law; it may subject the parties to a penalty, and, nevertheless, be recognized by the courts, and be given effect after it has been consummated."

With respect to the transaction here complained of, it was made, not only with the assent of all the stockholders, but with the assent of all the creditors save one; and as those who participated were the persons entitled to all the corporate property, and as the purpose sought to be effected was to secure this to them, no right of any third person was invaded or affected; nor should the court, after the transaction has gone through various stages so that the mortgage

has been foreclosed and the property sold to another corporation, adjudge the corporate action void at the instance of one who, in view of his conduct, must be regarded as having tacitly assented to it. And we cannot, in this connection, refrain from again quoting from *Kent* v. *Quicksilver Mining Co. :* " Where third parties have dealt with the company, relying in good faith upon the existence of corporate authority to do an act, there is not needed that there be an express assent thereto on the part of stockholders to work an equitable estoppel upon them. Their conduct may have been such, though negative in character, as to be taken for an acquiescence in the act; and when harm would come to such third parties if the act were held invalid, the stockholders are estopped from questioning it. We suppose acquiescence or tacit assent to mean the neglect to promptly and actively condemn the unauthorized act, and to seek judicial redress, after knowledge of the committal of it, whereby innocent third parties have been led to put themselves in a position from which they cannot be taken without loss. It is the doctrine of equitable estoppel, which applies to members of corporate or associated bodies as well as to persons acting in a natural capacity." (P. 187.)

For these reasons we think that the issue of an amount of bonds in excess of that allowed by statute should not be declared void at the instance of this plaintiff.

As to the remaining ground, that the mortgage was a transfer by the corporation of all its property and assets, thus virtually effecting a termination of its regular business, and, for this reason, illegal, it is only necessary to say that this was not the intention of any of the parties. The whole plan, as shown by the agreement and the provisions of the mortgage, was to continue the business of the corporation, which it was thought could be profitably done, and realize for the creditors the full amount of their claims. There was no intention of preventing it from carrying on the business for which it was incorporated. On the contrary, the intention was just the opposite, and the fact that in this all were disappointed is no reason for nullifying the mortgage.

Notwithstanding the claim, therefore, made by plaintiff that a great wrong has been perpetrated upon it by the defendants, we think, as already stated, that, having remained silent, knowing of

each step taken, and waiting until the rights of other persons had intervened, it should not be accorded relief which will injure other *bona fide* creditors whose rights have been acquired since the execution of the instrument assailed, and who would suffer loss because of an honest effort to protect all the creditors of the corporation alike.

The judgment should be affirmed, with costs.

VAN BRUNT, P. J., concurred in result.

FOLLETT, J. (dissenting):

January 26, 1885, the A. B. Cleveland Company (Limited) was incorporated under chapter 611 of the Laws of 1875 (the Business Corporation Act) with a capital of $65,000, divided into shares of $100 each. The stock was all issued for realty and personalty, no cash being paid in. By chapter 394 of the Laws of 1888, section 13 of the act of 1875 was amended so as to read as follows:

"Sec. 13. It shall be lawful for all such corporations to borrow money for the legitimate purposes of such corporation, and for such purpose to issue bonds with or without coupons attached thereto, or to mortgage any real estate which it may have or possess and bearing interest not exceeding six per centum per annum; but the amount of such bonds and such mortgages outstanding at any one time shall not exceed one-half of the value of the corporate property of such corporation. Any issue of such bonds and such mortgages beyond the amount herein specified shall render every director voting the same personally liable to any holder of such bonds or such mortgages for any damage caused by such overissue to such holder. No such mortgage or mortgages shall be issued however without first having obtained the written assent of its stockholders owning more than two-thirds of the stock of said corporation."

By this section a business corporation is authorized to mortgage its " real estate " for an amount not exceeding one-half of the value of its corporate property. April 17, 1889, the president and treasurer of the corporation assumed to execute a mortgage to Conrad N. Jordan, Horace K. Thurber and Peter W. Gallaudet upon all of the property of the corporation, real and personal, to secure the payment of $425,000, represented by 425 bonds of $1,000 each, and thereafter it immediately discontinued its business. Twelve days

later the trustees took possession of all of the property of the corporation under said conveyance. In November, 1889, the trustees reported that the value of the entire assets of the corporation was $327,621.81. The value of its real estate included in the above was $45,530. December 1, 1890, the value of its assets had been reduced to $298,999.25, which included $45,000 of real estate. It is conceded that when this mortgage was executed the corporation was hopelessly insolvent, but it is asserted that it was not known to be so by its directors and officers. This assertion does not seem to me to be sustained by the record. I think the mortgage should be declared void on two grounds: (1) That it was given in contemplation of insolvency; (2) that it covered all of the personal property of the corporation, and that it was given for more than twice the value of the corporate property of the mortgagor. In the prevailing opinion it is conceded that the corporation had no power to mortgage its personalty, but it sustains the judgment dismissing the complaint on the ground that the plaintiff was estopped. I am unable to find any evidence in the record upon which an estoppel can be based. I cannot assent to the proposition contained in the opinion that the power of a corporation to issue bonds is not limited by the section above quoted, nor can I concur in the position that the only remedy for an overissue is an action by a bondholder against the directors for his damages. This section was designed for the protection of shareholders and creditors of such corporations, and they may resist the validity of a mortgage given in violation of its provisions. Any creditor or shareholder of a corporation has the right to maintain an action to set aside any securities given or conveyances made in violation of the statute, and if the corporation is insolvent any shareholder or creditor has the right to have it wound up in accordance with the provisions of the statute, even though every other creditor and shareholder think a better way than the statutory one has been devised.

I think the judgment should be reversed and a new trial granted, with costs to the appellant to abide the event.

Judgment affirmed, with costs.