CENTRAL TRUST CO. OF NEW YORK v. COLUMBUS, H. V. & T. RY. CO. et al.

(Circuit Court, S. D. Ohio. April 25, 1898.)

1. POWERS OF CORPORATION—MODE OF EXERCISING—LIMITATION BY CHARTER.
    A business corporation may exercise all the powers within the fair and reasonable intent of the law under which it is organized, and, in doing so, may exercise a choice of means reasonably adapted to the end authorized, unless clearly limited to a particular method by its charter.

2. MORTGAGE BY CORPORATION—CHALLENGE BY SUBSEQUENT MORTGAGEE—VALIDITY.
    The validity of a mortgage executed in good faith by a corporation, and consented to by it and all its stockholders, cannot be successfully challenged as ultra vires by a subsequent mortgagee with notice, unless it is absolutely void, as wholly beyond the power of the corporation.

**3. SAME—MINING AND MANUFACTURING CORPORATION—TRANSPORTATION FACILITIES—MODE OF SECURING.**

Under Rev. St. Ohio, §§ 3862, 3863, giving to mining and manufacturing corporations power to purchase or subscribe for so much stock of transportation companies as they may deem necessary to procure proper transportation facilities, such a corporation may mortgage its real estate to guaranty the bonds of a railroad company, in consideration of such transportation facilities, and to enable such company to provide the same.

**4. SAME—INDEBTEDNESS IN EXCESS OF CAPITAL—SUBSEQUENT MORTGAGEE.**

Rev. St. Ohio, § 3256, provides that a corporation may borrow money not exceeding the amount of its capital stock, issue its notes or bonds therefor, and secure them by mortgage of its real or personal property, but does not declare indebtedness in excess of capital void. *Held*, that the mortgage of a corporation in excess of its capital stock is not void as to a subsequent mortgagee with notice, if upheld by the corporation and its stockholders.

**5. SAME—SUBSEQUENT MORTGAGEE—ESTOPPEL.**

A subsequent mortgagee is estopped to question the validity of prior mortgages to which his mortgage is expressly subject.

Butler, Notman, Joline & Mynderse, for complainant.
Wm. Church Osborn, for cross complainant.
James H. Hoyt and C. I. Hunter, for receiver.
Davies, Stone & Auerbach, for the Knickerbocker Trust Co.

LURTON, Circuit Judge. This is a consolidated cause, in which are united two suits to foreclose mortgages made by the Columbus, Hocking Valley & Toledo Railway Company and the Hocking Coal & Railway Company. They will be referred to in this opinion as the "Railway Company" and the "Coal & Railroad Company." The original foreclosure suit was filed by the Central Trust Company of New York, to foreclose a consolidated 5 per cent. mortgage of the two companies made to it as trustee, dated October 1, 1881. That mortgage was made to secure bonds to the aggregate amount of $14,500,000, of which $8,000,000 only were issued, the remainder being reserved in accordance with provisions contained in the mortgage, to take up outstanding divisional bonds; the Railway Company being the result of the consolidation of two or more companies. The suit was based upon defaults in the payment of interest. Prior to the filing of this foreclosure bill by the Central Trust Company, it had filed a bill in this court, based upon an unsecured claim; and upon its application a receiver had been appointed, and possession taken of all the property of the Railway Company. The Central Trust Company's foreclosure bill was therefore filed in the same court. The defendants to the original bill are the two mortgagors, the Knickerbocker Trust Company and the Guaranty Trust Company, trustees under subsequent mortgages. A decree pro confesso was entered against the two mortgagors. To this bill of the Central Trust Company, the Knickerbocker Trust Company and the Guaranty Trust Company have filed answers. Their interests are as follows: (1) The Knickerbocker Trust Company is trustee, substituted in the place of John H. Devereux, under a mortgage dated August 1, 1884, made by the Railway Company and the Coal & Railroad Company, and known as the "Joint Mortgage," securing 6 per cent. bonds issued by the two companies, to the amount of $2,000,000. Default was made June 1, 1897, in the payment of the interest on these bonds. (2)

The Guaranty Trust Company of New York is trustee under the general lien mortgage of the Railway Company, dated October 1, 1896, securing 4 per cent. bonds, of which $2,133,000 are outstanding, together with $18,290.93 scrip. Default was made July 1, 1897, in payment of interest thereon. The issue raised by the answers of the Knickerbocker Trust Company and the Guaranty Trust Company is, in substance, as follows: Whether or not the consolidated mortgage, so far as it relates to the lands of the Coal & Railroad Company, is valid, and constitutes a lien prior to the lien of the Knickerbocker Trust Company's mortgage; the Knickerbocker Trust Company asserting that the execution by the Coal & Railroad Company of the consolidated mortgage was ultra vires, and that the only valid mortgage affecting the Coal & Railroad Company's lands is the mortgage to the Knickerbocker Trust Company, securing bonds executed by both the Railway Company and the Coal & Railroad Company. Before the hearing upon the issues presented in the foreclosure bill of the Central Trust Company, the Knickerbocker Trust Company, as trustee of the joint mortgage, filed its original bill in this court to foreclose that mortgage. In this bill the parties defendant are the two mortgagors, the Central Trust Company, the Guaranty Trust Company, and the Ohio Land & Railway Company.

By this bill the Knickerbocker Trust Company affirmatively attacks the validity of the consolidated mortgage so far as it embraces the property of the Coal & Railroad Company. The Ohio Land & Railway Company was made defendant because of a certain lease made by it to the Coal & Railroad Company, dated March 19, 1894, under which it is alleged that the last-mentioned company pledged certain royalties from its coal lands by way of security for performance of its obligations under the lease. The Guaranty Trust Company was made defendant as a junior mortgagee, and answered, assailing the joint mortgage as invalid in respect to the Coal & Railroad Company's lands, and asserting the priority of the claim of the Ohio Land & Railway Company. The two causes were consolidated by order of the court, made upon stipulation; and, by the same order, the Central Trust Company was allowed to file an amendment to its bill, joining the Ohio Land & Railway Company as defendant. Such amendment was duly filed, and the Ohio Land & Railway Company answered. The bonds secured by the consolidated mortgage of October 1, 1881, to the Central Trust Company, are the bonds of the Railway Company only. The mortgage includes the property of both the Railway Company and the Coal & Railroad Company, the latter joining therein for the purpose of conveying its property to secure the bonds of the Railway Company. The validity of the bonds is not questioned. Neither is the validity of the mortgage challenged so far as the property of the Railway Company is concerned. Neither is the validity of the mortgage by the Coal & Railroad Company challenged by that company or any of its stockholders. The Knickerbocker Trust Company and the Guaranty Trust Company, as subsequent mortgagees of the Coal & Railroad Company, with con-

87 F.—52

structive notice of the consolidated mortgage, deny the validity of that mortgage so far as it includes property of the Coal & Railroad Company. The bonds issued under the consolidated mortgage are, so far as this record shows, in the hands of bona fide purchasers, with no other notice of the purposes for which the Coal & Railroad Company joined in the mortgage than such as appear in the recitals of the bonds and upon the face of the mortgage securing them. The question of ultra vires is that upon which the decision must turn.

The Hocking Coal & Railroad Company was incorporated September 17, 1881, under the provisions of Rev. St. Ohio, § 3235 et seq. Its authorized capital stock was $3,000,000. Section 3235 is as follows:

"Corporations may be formed in the manner provided in this chapter for any purposes for which individuals may lawfully associate themselves, except for dealing in real estate or carrying on professional business; and if the organization is private it must have a capital stock."

Section 3866 of the Revised Statutes provides:

"Companies organized for the purpose of mining, quarrying or manufacturing, may, when such purpose is stated, in the articles of incorporation, construct a railroad with a single or double track, with such side-tracks, turn-outs, offices and depots as they may deem necessary to carry out the objects of the incorporation, from any mine, quarry, or manufactory to any other railroad, or any canal, slack water navigation, or other navigable water or place within or upon the borders of this state, and shall in respect to such railroad be subject to and governed by the provisions of chapter 2."

The articles of incorporation of the Hocking Coal & Railroad Company contain the following provision:

"Said corporation is formed and organized for the purpose of mining coal and iron ore, and transporting the same to market; also, for manufacturing ores and iron, and carrying on such incidental business as is usual in such cases. Said corporation shall also possess all the powers conferred by statute to own, build, and construct railroads, to acquire and hold stock in railroads, and all powers to own, acquire, or hold transportation, railroad, or stock shares or bonds conferred in any case upon coal or other mining companies in this state. Said corporation shall also have the power to build a railroad from its mines to any other railroad. It is understood that this company will acquire lands and carry on its mining and manufacturing chiefly in the counties of Hocking, Perry, Athens, and Vinton, in the state of Ohio, but that it shall not be confined in its mining, manufacturing, or building, or owning of railroads to said counties."

On September 19, 1881, the incorporators met, and received subscriptions to the amount of $1,500,000 of stock, which, by the record of that company, appears to have been paid in. Directors and officers were elected September 30, 1881. At a meeting of the directors held on same day, propositions for the sale to the company of coal lands to the extent of 10,000 acres were received and accepted, for which $1,500,000 were to be paid in cash within 60 days. On the same day a resolution in the following terms was adopted:

"Resolved, that this company, for the purpose of enabling the Columbus, Hocking Valley and Toledo Railway Company to sell and negotiate its consolidated bonds to the amount of $14,500,000, and at the request of said Railway Company, and in view of the additional benefits to be derived by this company from the increased facilities to be afforded by said Railway Company in the transportation of its coal and iron ore and otherwise, and in consideration of the

sum of $1,000 this day paid by said Railway Company to this company, hereby consents and agrees to become a party to the mortgage to be executed to said Railway Company to secure said bonds, and hereby authorizes its president and secretary to unite in said mortgage to be executed by said Railroad Company to secure said $14,500,000 of bonds, and to secure the payment of said bonds and interest, upon all the lands, real estate, and property of this company, being 10,000 acres and over of coal and mineral lands held by this company in fee simple in the counties of Hocking, Perry, and Athens, in the state of Ohio, and which are to be particularly described in said mortgage.

"Resolved, that the president and board of directors, having examined the resolutions passed by said Railway Company in respect to the execution of said mortgage, and the terms and conditions upon which it is to be executed, and having seen and examined said mortgage as the same has been prepared for execution, are content and satisfied with the terms and conditions of said mortgage, and assent to the same, and authorize the president and the secretary of this company to execute said mortgage with said Railway Company for the purposes therein expressed, and to embrace in said mortgage all the lands held and owned by this company as aforesaid, and to make said mortgage and bonds a first lien upon the said lands."

This resolution was also submitted on the same day to a meeting of the stockholders, and unanimously adopted.

The mortgage referred to in these resolutions is the mortgage designated as the "consolidated mortgage," and was duly executed and delivered October 1, 1881. That mortgage, among other things, recites that:

"Whereas, the said Hocking Coal & Railroad Company is the owner of ten thousand acres of coal lands and real estate, situated in the counties of Hocking, Perry, and Athens, aforesaid, and whereas, said Coal and Railroad Company is desirous that the said Columbus, Hocking Valley & Toledo Railway Company should execute this mortgage, and make the loan provided for therein, and for that purpose the said Hocking Coal and Railroad Company, by the unanimous vote of its directors and stockholders, being desirous of enabling said railway company to make the loan herein provided for, and to receive the benefit to its property which will come by the greater facilities thus afforded to it in the transportation of its coal and iron ores hereafter to be mined, and its iron hereafter to be manufactured, enters into this mortgage, and secures the payment of the bonds hereinafter mentioned, and interest thereon upon its real estate hereinafter described."

In the subsequent parts of this mortgage, the resolution of the directors and stockholders authorizing its execution is set out in full. At the date of this mortgage, the Railway Company appears to have been the sole stockholder in the Coal & Railroad Company. Thus, on September 30, 1881, the persons who had subscribed for the stock of the Coal & Railroad Company acquired their stock by an instrument in these words:

"Cleveland, Ohio, September 30, 1881.

"We, the undersigned, hereby sell, assign, and transfer to M. M. Greene, president and trustee of the Columbus, Hocking Valley & Toledo Railway Company, all of our stock now held or owned by us, and each of us, in the Hocking Coal & Railroad Company; and we hereby authorize said Hocking Coal & Railroad Company to transfer said stock on its books to said M. M. Greene, president and trustee, and to issue to him a certificate therefor.

"Continental Coal Company,
"By Wm. J. McKinnie, President.
"W. J. McKinnie.
"Wm. B. Sanders.
"Charles G. Hickox.
"H. Fenninger.
"J. J. Purcell."

The only certificate for stock which ever appears to have been issued was in these words:

"Certificate No. 1, Issued to M. M. Greene, President-Trustee, Columbus, Hocking Valley & Toledo Railway Company, of Columbus, Ohio, 15,000 shares, September 30, A. D. 1881."

Whether the Coal & Railroad Company was ever paid by the subscribers for its stock, or whether the subscribers were ever paid by the Railway Company for their stock, does not satisfactorily appear on this record. The fact is unimportant upon the issues here to be tried. That the Railway Company controlled and voted this stock, both when this mortgage was authorized and when it was executed and delivered, does sufficiently appear on the minutes of the Railway Company, which have the appearance of a record made to subserve some undisclosed purpose. Thus, on November 2, 1881, there appears a resolution in these words:

"Resolved, that the president of this company is hereby directed to hand over to Stevenson Burke six million four hundred thousand dollars ($6,400,000) of the consolidated mortgage bonds of this company."

Below, and originally a part of this entry, there appears the following words: "To apply to the purchase of the stock of the Hocking Coal & Railroad Company,"—which words now appear to have been erased. No explanation of this is offered.

On August 14, 1882, the same minutes show the following action:

"Resolved, that the president be, and is hereby, directed to purchase the whole of the stock of the Hocking Coal & Railroad Company, which covers and represents ten thousand acres of coal lands in Hocking, Perry and Athens counties, amounting to fifteen thousand shares at and for the price of eight million dollars, payable in the consolidated bonds of this company, dated September 1st, 1881, at their par value; that the title to such stock be taken in the name of the president, as trustee for this company.

"Thereupon, during the meeting, the president reported that he had purchased said fifteen thousand shares of the capital stock of said Hocking Coal & Railroad Company, at and for the price of eight million dollars, and paid therefor, in the bonds of this company, at the price above mentioned. And thereupon, on motion, it was resolved, that the purchase of said Hocking Coal & Railroad Company's stock, as aforesaid, be, and the same is hereby, ratified, approved, and confirmed."

The relation of the Coal & Railroad Company and the Railway Company to each other, as shown by this stock transaction, and by the three mortgages here involved, most clearly indicates that the former was a mere auxiliary of the latter; and, although they must be regarded as legally distinct corporations, they were equitably and substantially but one. This fact, though not determinative as to the power of the Coal & Railroad Company to mortgage its property to secure a debt of the Railway Company, is still of some significance when we come to consider whether its mortgage is to be regarded as a mere security for the debt of the Railway Company. That the Coal & Railroad Company had the power to make a mortgage to secure its own debts is not disputed. Neither is it contended for the complainant that one corporation, in the absence of express or implied authority in its constituting law, has the power to appropriate its capital for the benefit of another, or in a business not authorized by its charter. The general doctrine is well settled that a mining or man-

ufacturing corporation cannot lend its credit nor employ its resources for any purposes or objects not fairly within the business it is authorized to conduct. Pearce v. Railroad Co., 21 How. 441; Green Bay & M. R. Co. v. Union Steamboat Co., 107 U. S. 98, 2 Sup. Ct. 221; Humboldt Mining Co. v. Variety Iron-Works Co., 22 U. S. App. 334, 10 C. C. A. 415, and 62 Fed. 356; Vault Co. v. Boynton, 37 U. S. App. 602, 19 C. C. A. 118, and 71 Fed. 797. But it is equally clear that a business corporation may exercise all the powers within the fair and reasonable intent of the law under which it is organized, and, in doing so, may exercise a choice of means reasonably adapted to the end authorized, unless it is clearly and explicitly limited to a particular method defined by its charter. The validity of the mortgage to the Central Trust Company is not challenged by the corporation which made it, nor by any stockholder. The latter unaninnously consented to its execution, and, if a mortgage for the purposes indicated upon the face of this conveyance could be validly made at all, the corporation is undoubtedly bound. The question as to its validity is made only by two subsequent mortgagees, who accepted their respective securities with full notice of the existence of this prior incumbrance. Unless, therefore, the instrument is absolutely void, as wholly beyond the power of the corporation, it must be regarded as a valid security.

The Coal & Railroad Company was not formed for the purpose of mining coal alone. Its articles of association stated that its purposes were much wider, and included the mining of iron ore and its manufacture into iron, and the transportation of all its products to market. In addition, the purpose to construct a railroad and to own stock in railroads or other transportation companies was also asserted. We must look to the statutes of Ohio to see how far these various purposes might be combined in one corporation, and what powers are conferred upon such a company. This corporation was organized under the general incorporation law of Ohio, and its powers are therein defined. Section 3235, Rev. St. Ohio, provides that corporations may be organized for any purpose "for which individuals may lawfully associate themselves"; and section 3866 gives power to any mining company, when such purpose is stated in the articles of association, to construct a railroad from its mines to any other railroad, or to navigable water within or upon the border of the state, if such railroad shall be deemed necessary to carry out the objects of the incorporation. The articles of association, showing the purpose of this company to engage in both mining and manufacturing, and to construct a railroad in aid of that business, have already been set out. By section 3862 and 3863, power is given such mining and manufacturing companies "to purchase or subscribe for, in the name of the company, such an amount of the stocks of any railroad, or other transportation company, as they deem necessary, in order to procure proper facilities for transportation for the manufactories, mines, or other works of the company." These are the provisions of the general law under which this Coal & Railway Company was organized which have any direct bearing upon the issues here to be decided.

The object of the Railway Company in issuing its bonds, and in making a mortgage upon its property, stated in the face of the mortgage itself, was—First, to apply $6,500,000 in exchange for prior divisional bonds; second, to apply the proceeds arising from the sale of the remaining bonds in double-tracking, equipping, and improving its railway, and in the purchase of such property as the interests of the company should require. The bonds issued for these latter purposes are the only bonds actually issued, and aggregate $8,000,000. The inducement moving the Coal & Railroad Company to join in the mortgage stated on the face of the mortgage was that:

"Said Coal and Railroad Company is desirous that the said Columbus, Hocking Valley & Toledo Railway Company should execute this mortgage, and make the loan provided for therein; and for that purpose the said Hocking Coal & Railroad Company, by the unanimous vote of its directors and stockholders, being desirous of enabling said Railway Company to make the loan herein provided for, and to receive the benefit to its property which will come by the greater facilities thus afforded to it in the transportation of its coal and iron ores hereafter to be mined, and its iron hereafter to be manufactured, enters into this mortgage, and secures the payment of the bonds hereinafter mentioned, and interest thereon, upon its real estate hereinafter described."

The Coal & Railroad Company owned mineral lands in several counties, which lands were contiguous to the existing line of the Railway Company. That railroad extended from navigable water on the northern border of the state, at Toledo, to navigable water on the southern border of the state, at Pomeroy. It was just such a railroad as the Coal & Railroad Company was authorized to construct by the provisions of section 3866 of the Ohio Revised Statutes. If the facilities of the existing railway were not such as to serve the necessities of this mining company, but could be made so by double-tracking, branches, switches, depots, or greater special equipments, I see no reason why it might not have purchased or subscribed to the stock of the Railway Company, if, by so doing, it could procure the transportation facilities it needed. The power to do this is found in section 3863, Rev. St., which provides that:

"The directors of any such [mining] company may authorize its president to purchase or subscribe for, in the name of the company, such an amount of the stocks of any railroad or other transportation company, as they deem necessary, in order to procure proper facilities for transportation for the manufactories, mines, or other works of the company."

The power existed to obtain needed transportation by either building a railroad for itself or by subscribing to the stock of a railroad company. It exercised this power, not by construction, nor by subscribing to the stock of a railway company, but by mortgaging its property to secure the bonds to be issued by a railway company to obtain means to double-track and otherwise enlarge its facilities as a transportation company serving the Coal & Railroad Company. That this was the purpose of this mortgage appears from the resolution of the stockholders of the Coal & Railroad Company set out on the face of the mortgage. The mortgagees are entitled to stand upon this record declaration of the purposes of the mortgagor. They had no other information or source of information, and could not be presumed to know that

an ulterior purpose (if any there was) was to be subserved, not authorized by the mortgagor company. A purchaser of one of the bonds secured under this mortgage would undoubtedly be charged with notice of the general powers of the Coal & Railroad Company, and would be required to take notice of all that appeared upon the face of the bond and of the mortgage under which it was secured. If he turned to the mortgage, he would find the Railway Company had issued the bonds to "enable it to borrow money found necessary to be used in building and double-tracking its road, paying for property purchased and to be purchased, improvements made and to be made, and for the equipment of its said line of railroad, providing terminal facilities, constructing docks, building bridges, and otherwise extending and enlarging its capacity for the transportation of freight and passengers, and for other general purposes of said railway." He would find also that the Coal & Railroad Company extended the mortgage to its property for the purpose of enabling said Railway Company to make the loan provided for, and to receive the benefits "to be derived by this company from the increased facilities to be afforded by the said Railway Company in the transportation of its coal and iron ores," etc. The fair inference to be drawn from these recitals of the instrument is that the relation of the Coal & Railroad Company to the Railway Company was not that of a mere accommodation security or guarantor, but was that it had, in effect, guarantied the bonds of the Railway Company as a means of acquiring needed additional transportation facilities.

What the Coal & Railroad Company did was this: It found an existing railway, and aided it in raising means to enlarge its transportation facilities, by guarantying its bonds, and thus obtained for itself needed transportation through that method, rather than by building a railway or subscribing to the stock of one. The purpose to obtain adequate transportation facilities was one clearly within the general powers of the corporation. It may be that the facilities it had in the railroad as then existing were sufficient, and that the proposed improvements were not needed, or that the mortgage was not in good faith intended to secure such transportation facilities, or that the proceeds of the bonds so secured were intentionally misapplied. But this is no answer to innocent holders of the securities which were thus given credit and placed on the market, ostensibly for an authorized purpose. Mor. Priv. Corp. § 609; Railway Co. v. Hawkes, 5 H. L. Cas. 331–371. In the case last cited was involved a contract made by a railroad company for the purchase of lands not, in fact, needed or useful for the legitimate purposes of the company, and therefore was an unlawful acquisition. Yet this contract was specifically enforced in favor of the vendor, who had a right to assume the purchase was for a legitimate corporate purpose. Lord St. Leonards said:

"Where the party contracting with the directors is not aware of any intended misapplication on their part, I am of opinion that the contract is binding, although it can afterwards be shown that the property really was not acquired for the railway. The safety of men in their daily contracts requires that this doctrine of ultra vires should be confined within narrow bounds."

To the same effect are the cases of Mayor of Norwich v. Norfolk Ry. Co., 4 El. & Bl. 397.

The stockholders unanimously agreed to this method of obtaining better transportation facilities. There were then no creditors to be affected. What was done injured no one having any interest, direct or indirect. The creditors now challenging the mortgage became such with full knowledge of this prior mortgage, and have no higher legal right to avoid this security than the corporation itself would have. It was not a mere accommodation security. By lending its credit, it, in effect, purchased transportation facilities as effectually as if it had subscribed for the stock of the company in order to acquire what it needed, or had in any other way used its capital in the acquisition of means of transportation. Section 3266 of the Revised Statutes of Ohio provides that "no corporation shall employ its stocks, means, assets or other property, directly or indirectly, for any other purpose whatever than to accomplish the legitimate objects of its creation." But this is nothing more than common law, and gives no added force to the well-settled rule so often stated by the courts of Ohio and all other tribunals administering the common law. Under any fair and reasonable construction of the recitals of the objects and purposes of this mortgage, it was executed by the Coal & Railroad Company "for no other than to accomplish the legitimate objects of its creation." The particular means adopted are not expressly prohibited; nor, under any fair and reasonable interpretation of the powers conferred, can we say that the method adopted of accomplishing an authorized corporate purpose was intended to be excluded by the provisions of the Ohio law in respect to this class of companies. In accomplishing a lawful corporate purpose, a reasonable chain of means adapted to ends must be regarded as within the legislative intent, unless a contrary purpose is clearly indicated. Mor. Priv. Corp. §§ 320-323; City of Bridgeport v. Housatonuc R. Co., 15 Conn. 475; Thompson v. Railroad Co., 3 Sandf. Ch. 625; Jones v. Guaranty Co., 101 U. S. 622; Ellerman v. Stockyards Co., 49 N. J. Eq. 217, 23 Atl. 287.

The primary question here is one of construction: Was this method of accomplishing an authorized corporate purpose so far in excess of the granted powers of this corporation as that the mortgage is absolutely void, and not in the way of a subsequent mortgage by the same mortgagor to a mortgagee having constructive notice of its existence?

In Attorney General v. Great Eastern Ry. Co., 5 App. Cas. 473, 478, 481, the lord chancellor, referring to Railway Co. v. Riche, L. R. 7 H. L. 653, said:

"It appears to me to be important that the doctrine of ultra vires, as it was explained in that case, should be maintained. But I agree with Lord James that this doctrine ought to be reasonably, and not unreasonably, understood and applied, and that whatever may be fairly regarded as an incident to or consequential upon those things which the legislature has authorized ought not (unless expressly prohibited) to be held, by judicial construction, to be ultra vires."

In the same case, Lord Blackburne said that:

"Those things which are incident to, and may reasonably and properly be done under, the main purpose, though they may not be literally within it, would not be prohibited."

In Green Bay & M. R. Co. v. Union Steamboat Co., 107 U. S. 100, 2 Sup. Ct. 221, a railway company was authorized to build, construct, and run, as a part of their corporate property, such number of steamboats as they may deem necessary to facilitate the business operations of the company. It made a contract guarantying that the gross earnings of each steamer of an independent steamboat company should equal a certain sum for each of two years if it would run a line in connection with the railway company. When sued upon this agreement, it relied upon the defense of ultra vires. The contract was held to be valid. In considering the question as to whether the power to construct and run a line of boats in connection with its railroad implied the power to guaranty the earnings of an independent line of boats, the court said:

"The general doctrine upon this subject is now well settled. The charter of a corporation, read in connection with the general laws applicable to it, is the measure of its powers; and a contract manifestly beyond those powers will not sustain an action against the corporation. But whatever, under the charter and other general laws reasonably construed, may fairly be regarded as incidental to the objects for which the corporation is created, is not to be taken as prohibited."

In Marbury v. Tod, 22 U. S. App. 267, 10 C. C. A. 393, and 62 Fed. 335, affirming Tod v. Land Co., 57 Fed. 47, this court sustained a guaranty of the bonds of a railroad company by a land company, upon the ground that a power to consolidate with a railroad company implied power to induce the building of a railroad necessary to the successful working of the business of the land company by guarantying its bonds.

In Zabriskie v. Railroad Co., 23 How. 381, the guaranty of the bonds of one Ohio railroad company by another Ohio railway company was sustained, under section 3300, Rev. St. Ohio, which gave power to railway companies to aid another in the construction of its road, "by means of a subscription to the capital stock of such company or otherwise."

In Hill v. Nisbet, 100 Ind. 341, power to consolidate was held to imply power to purchase stock in another company with a view to consolidate.

A corporation having power to buy and improve, lease, and sell lands, was held to have power to contribute to the building of a railroad by which its property was rendered accessible. Vandall v. Dock Co., 40 Cal. 83. A similar corporation, with like powers, was held to have power to contribute to a college which it was proposed to establish, although not upon the company's lands. Whetstone v. Ottawa University, 13 Kan. 320. A company authorized to buy and hold and develop wild lands, "and to aid in the development of minerals and other materials, and to promote the clearing and settlement of the country," was held to have power to build sawmills and an hotel for the accommodation of those having business with the company. The same corporation had power to employ their capital in the construction of such railways. not exceeding twenty miles in length, as may be necessary from such mines. to intersect the Sunbury and Erie or the Allegheny Valley Railroad. The directors subscribed an amount greater than the entire authorized capital of the corporation to the

stock of the Sunbury & Erie Railroad Company, under an agreement that that company would build to the lands of the subscribing company. The shareholders sought to hold the directors liable to them as for a diversion of corporate assets. The court held that, though the subscription was excessive and ultra vires the directors, yet it had been ratified by the shareholders, and the directors were therefore not liable.

In ascertaining the powers of a corporation, great regard must necessarily be paid to the character of the business which the particular company is authorized to conduct; for the general rule is that a business corporation may, in the conduct and management of its authorized business, adopt the means reasonably appropriate and usually adopted by individuals in the conduct of the same kind of business. This rule finds illustration in many of the cases, and in the case of Ft. Worth City Co. v. Smith Bridge Co., 151 U. S. 294, 14 Sup. Ct. 339. There a corporation created for the purpose of dealing in lands, by subdividing and selling, and having power "to enter into obligations or contracts essential to the transaction of its authorized business," obligated itself to pay to a bridge company one-third the cost of constructing a bridge over the Trinity river, whereby the property of the land company would be made accessible. The bridge was to be constructed upon one of the public streets of the city of Ft. Worth, and was the property of the city. The remainder of the cost of the bridge was to be borne in equal shares by the city and the county of Tarrant. The land company, when sued by the bridge company for its contribution to the cost of the bridge, denied the validity of its contract. The court held the contract valid, saying:

"The object of the creation of the corporation was the acquisition and sale of lands on subdivision; and it cannot be successfully denied that that object would be directly promoted by the use of legitimate business methods to render the lands accessible. This involved the expenditure of money or the assumption of liability; but there is no element in this case of any unreasonable excess in that regard or of the pursuit of any abnormal and extraordinary method. The result sought was in accomplishment of the legitimate objects of the corporation and essential to the transaction of its authorized business: and the power to make the contract was fairly incidental, if not expressly granted."

Thus, while some corporations might be, from the very nature of their business, authorized to lend their credit or invest in the stocks of other corporations, yet manufacturing or mining corporations would have no authority to guaranty the contracts of another, nor to purchase shares for the purpose of controlling another nor to appropriate their assets to support the credit of another, or of an individual or firm. That an unauthorized use of corporate property was of benefit and advantage to the business of such a corporation is no justification, and will not validate a transaction if it be not within the general scope of its granted powers. This is all that was decided in the cases of Humboldt Mining Co. v. Variety Iron-Works Co., 22 U. S. App. 334, 10 C. C. A. 415, and 62 Fed. 356; Vault Co. v. Boynton, 37 U. S. App. 602, 19 C. C. A. 118, and 71 Fed. 797; and Valley Ry. Co. v. Lake Erie Iron Co., 46 Ohio St. 44, 18 N. E. 486. The case last cited involved only the question of the power of the iron company to invest its capital in

the stock of a railway company. It was held that no authority existed in the iron company to subscribe to the capital stock of the railway company. The question in that case arose between the companies themselves, under a suit based upon the contract of subscription. Here the question is made by a subsequent creditor only, and after the execution of the mortgage, and after the bonds secured thereunder had passed into circulation. The iron company had no express power to subscribe for stock in a railway company. The Coal & Railroad Company did have express power to obtain needed transportation facilities, either by building a railroad or by subscribing to or purchasing the stock of one. The iron company had no power in respect to the subject of acquiring railroad facilities. The procuring of adequate transportation facilities was a subject within the granted powers of the Coal & Railroad Company, and the only objection which can be made to what it did is that it did not exercise its powers in the particular mode mentioned in its charter.

The case falls much more nearly under Ehrman v. Insurance Co., 35 Ohio St. 324–337. There one Ohio corporation had absorbed another, and acquired real estate and other property which it was not authorized to acquire or hold under its charter. Among the assets so obtained was the note in suit. The maker of the note, when sued, denied the title of the plaintiff, upon the ground that its absorption of the corporation to whom the note was payable, and the acquisition thereby of property which it was not authorized to hold, was ultra vires. This defense was overruled, upon the ground that the title of the offending corporation could not be defeated by one who was a stranger to the transaction. In discussing the general subject of ultra vires contracts, White, J., said:

"In applying the doctrine of ultra vires in a particular case, regard must not only be had to the unauthorized agreement or transaction, but also to the relation which the litigating parties sustain to it. Where there is an absolute and total want of power in a corporation to deal in respect to a given subject, it may be that acts done in the name of the corporation, in regard to such subject, would, as corporate acts, be void for all purposes and as against all persons. But there is an obvious distinction between such a case and one where the corporation deals with a subject within the scope of its granted powers, but for a purpose or in a mode not authorized by its charter. Thus, where property which the corporation. under certain circumstances, is authorized by its charter to acquire, is purchased, in a mode or for a purpose not authorized, it seems clear to us that the title of the corporation to the property cannot be defeated by a party who is a stranger to the agreement by which the property was acquired, and who is not injured by the transfer."

2. It is next objected that this mortgage is void because the amount of the bonds secured exceeds the amount of the stock of the Coal & Railroad Company. The Revised Statutes of Ohio, affecting corporations of the class to which the Coal & Railroad Company belongs, provide that a corporation may borrow money not exceeding the amount of its capital stock, and issue its note or coupon and registered bonds therefor, bearing any rate of interest authorized by law, and may secure payment of the same by a mortgage of its real or personal property, or both. Rev. St. Ohio,

828

§ 3256. This limitation as to third persons must be regarded as applying to the authorized, and not the subscribed, stock. Farmers' Loan & Trust Co. v. Toledo, A. A. & N. M. Ry. Co., 67 Fed. 49; Water Co. v. De Kay, 36 N. J. Eq. 548. The Coal & Railroad Company was not borrowing money. The Railway Company was the borrower, and its capital stock was $20,000,000. But, assuming that if the Coal & Railroad Company could not mortgage its property to secure its own debt in excess of its capital stock, it could not mortgage it for the debt of another to any greater amount, the mortgage is not thereby rendered so absolutely void as that subsequent creditors can be heard to complain. The same question has many times been decided in favor of creditors. New Britain Nat. Bank v. Cleveland Co., 91 Hun, 447, 36 N. Y. Supp. 387; Sioux City Terminal R. & W. Co. v. Trust Co. of North America, 27 C. C. A. 73, 82 Fed. 124; Farmers' Loan & Trust Co. v. Toledo, A. A. & N. M. Ry. Co., 67 Fed. 49; Allis v. Jones, 45 Fed. 148; Wood v. Waterworks Co., 44 Fed. 146; Reed's Appeal, 122 Pa. St. 565, 16 Atl. 100; Water Co. v. De Kay, 36 N. J. Eq. 548. Raymond v. Railroad Co., 21 Wkly. Law Bul. 103, was a case arising under this same provision of the Ohio Revised Statutes, and the question was fully considered by Judge Peck, of the superior court of Cincinnati. The execution of the mortgage was within the general scope of the powers of the corporation, and this objection is only that it is in excess of the limitations imposed upon the exercise of that power. The statute does not declare that indebtedness in excess of capital stock shall be null and void. The corporation and every shareholder consented, and will not therefore be heard to complain. The transaction was not on its face immoral, and involved no turpitude. The objection comes from subsequent creditors, who, with knowledge that the indebtedness thus secured was in excess of the authorized capital stock, voluntarily added to that excess, and now seek to sweep out of the way a prior assumption of liability that they may profit by it. Such subsequent creditors stand in the shoes of the mortgagor, and, if it could not object, they cannot. For such a violation of the limits imposed by law upon the power of the Coal & Railroad Company to create an indebtedness, the state alone should be heard to complain. The cases holding valid mortgages taken by national banks to secure loans made at the time are in point. Neither the borrower nor subsequent creditors will be heard to object. Bank v. Matthews, 98 U. S. 621–629; Bank v. Whitney, 103 U. S. 99–103; Fritts v. Palmer, 132 U. S. 282–292, 10 Sup. Ct. 93; Bank v. Townsend, 139 U. S. 67, 11 Sup. Ct. 496. The same conclusion was reached by the court of appeals of the Eighth circuit in Sioux City Terminal R. & W. Co. v. Trust Co. of North America, 27 C. C. A. 73, 82 Fed. 124–133 et seq., the opinion being by Sanborn, circuit judge.

3. The mortgage to the Knickerbocker Trust Company is one jointly executed by the Railway Company and the Coal & Railroad Company, to secure $2,000,000 of the joint bonds of the two corporations. The mortgage recites that the bonds are issued for the purpose of improving both properties. The only attack on this

mortgage is made by the Guaranty Trust Company, which is a third mortgagee. This mortgage expressly recognizes the mortgage to the Central Trust Company and that to the Knickerbocker Company as existing prior mortgages, and is expressly subject to them. This is an estoppel, and we need not consider the objections it urges to either of said mortgages. Bronson v. Railroad Co., 2 Wall. 283.

4. If any question shall arise under the answer of the Ohio Land & Railway Company as to the royalties due from the Coal & Railroad Company, it may be presented hereafter upon the coming in of the report heretofore ordered upon that matter.

5. A decree of foreclosure will be drawn, which may be presented to me hereafter, and the terms settled, if there shall be disagreement.